## NATIONAL BELLAS HESS, INC. *v.* DEPARTMENT OF REVENUE OF THE STATE OF ILLINOIS.

No. 241. Argued February 23, 1967.—Decided May 8, 1967.

*Archibald Cox* argued the cause for appellant. With him on the briefs were *Herman A. Benjamin* and *Julian R. Wilheim.*

*Terence F. MacCarthy,* Special Assistant Attorney General of Illinois, argued the cause for appellee. With him on the brief were *William G. Clark,* Attorney General, and *Richard A. Michael,* Assistant Attorney General.

*James B. Lewis* and *Jay H. Topkis* filed a brief for the American Heritage Publishing Co., Inc., as *amicus curiae,* urging reversal.

MR. JUSTICE STEWART delivered the opinion the Court.

The appellant, National Bellas Hess, is a mail order house with its principal place of business in North Kansas

City, Missouri. It is licensed to do business in only that State and in Delaware, where it is incorporated. Although the company has neither outlets nor sales representatives in Illinois, the appellee, Department of Revenue, obtained a judgment from the Illinois Supreme Court that National is required to collect and pay to the State the use taxes imposed by Ill. Rev. Stat. c. 120, § 439.3 (1965).[1] Since National's constitutional objections to the imposition of this liability present a substantial federal question, we noted probable jurisdiction of its appeal.[2]

The facts bearing upon National's relationship with Illinois are accurately set forth in the opinion of the State Supreme Court:

> "[National] does not maintain in Illinois any office, distribution house, sales house, warehouse or any other place of business; it does not have in Illinois any agent, salesman, canvasser, solicitor or other type of representative to sell or take orders, to deliver merchandise, to accept payments, or to service merchandise it sells; it does not own any tangible property, real or personal, in Illinois; it has no telephone listing in Illinois and it has not advertised its merchandise for sale in newspapers, on billboards, or by radio or television in Illinois."[3]

All of the contacts which National does have with the State are via the United States mail or common carrier. Twice a year catalogues are mailed to the company's active or recent customers throughout the Nation, including Illinois. This mailing is supplemented by advertising "flyers" which are occasionally mailed to past and potential customers. Orders for merchandise are mailed by the

---

[1] 34 Ill. 2d 164, 214 N. E. 2d 755.

[2] 385 U. S. 809.

[3] 34 Ill. 2d, at 166–167, 214 N. E. 2d, at 757.

customers to National and are accepted at its Missouri plant. The ordered goods are then sent to the customers either by mail or by common carrier.

This manner of doing business is sufficient under the Illinois statute to classify National as a "[r]etailer maintaining a place of business in this State," since that term includes any retailer:

> "Engaging in soliciting orders within this State from users by means of catalogues or other advertising, whether such orders are received or accepted within or without this State." Ill. Rev. Stat. c. 120, § 439.2 (1965).

Accordingly, the statute requires National to collect and pay to the appellee Department the tax imposed by Illinois upon consumers who purchase the company's goods for use within the State.[4] When collecting this tax, National must give the Illinois purchaser "a receipt therefor in the manner and form prescribed by the [appellee]," if one is demanded.[5] It must also "keep such records, receipts, invoices and other pertinent books, documents, memoranda and papers as the [appellee] shall require, in such form as the [appellee] shall require," and must submit to such investigations, hearings, and examinations as are needed by the appellee to administer and enforce the use tax law.[6] Failure to keep such records or to give required receipts is punishable by a fine of up to $5,000 and imprisonment of up to six months.[7] Finally, to allow service of process on an out-of-state company like National, the statute designates the Illinois Secretary of State as National's appointed agent, and jurisdiction in tax collection suits attaches

[4] Ill. Rev. Stat. c. 120, § 439.3 (1965).

[5] *Id.*, § 439.5.

[6] *Id.*, § 439.11.

[7] *Id.*, § 439.14.

when process is served on him and the company is notified by registered mail.[8]

National argues that the liabilities which Illinois has thus imposed violate the Due Process Clause of the Fourteenth Amendment and create an unconstitutional burden upon interstate commerce. These two claims are closely related. For the test whether a particular state exaction- is such as to invade the exclusive authority of Congress to regulate trade between the States, and the test for a State's compliance with the requirements of due process in this area are similar. See *Central R. Co.* v. *Pennsylvania,* 370 U. S. 607, 621–622 (concurring opinion of MR. JUSTICE BLACK). As to the former, the Court has held that "State taxation falling on interstate commerce . . . can only be justified as designed to make such commerce bear a fair share of the cost of the local government whose protection it enjoys." *Freeman* v. *Hewit,* 329 U. S. 249, 253. See also *Greyhound Lines* v. *Mealey,* 334 U. S. 653, 663; *Northwestern Cement Co.* v. *Minnesota,* 358 U. S. 450, 462. And in determining whether a state tax falls within the confines of the Due Process Clause, the Court has said that the "simple but controlling question is whether the state has given anything for which it can ask return." *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444. See also *Standard Oil Co.* v. *Peck,* 342 U. S. 382; *Ott* v. *Mississippi Barge Line,* 336 U. S. 169, 174. The same principles have been held applicable in determining the power of a State to impose the burdens of collecting use taxes upon interstate sales. Here, too, the Constitution requires "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." *Miller Bros. Co.* v. *Maryland,* 347 U. S. 340, 344–345; *Scripto,*

---

[8] *Id.,* § 439.12a.

*Inc.* v. *Carson,* 362 U. S. 207, 210–211.[9]   See also *American Oil Co.* v. *Neill,* 380 U. S. 451, 458.

In applying these principles the Court has upheld the power of a State to impose liability upon an out-of-state seller to collect a local use tax in a variety of circumstances. Where the sales were arranged by local agents in the taxing State, we have upheld such power. *Felt & Tarrant Co.* v. *Gallagher,* 306 U. S. 62; *General Trading Co.* v. *Tax Comm'n,* 322 U. S. 335. We have reached the same result where the mail order seller maintained local retail stores. *Nelson* v. *Sears, Roebuck & Co.,* 312 U. S. 359; *Nelson* v. *Montgomery Ward,* 312 U. S. 373.[10] In those situations the out-of-state seller was plainly accorded the protection and services of the taxing State. The case in this Court which represents the furthest constitutional reach to date of a State's power to deputize an out-of-state retailer as its collection agent for a use tax is *Scripto, Inc.* v. *Carson,* 362 U. S. 207. There we held that Florida could constitutionally impose upon a Georgia seller the duty of collecting a state use tax upon the sale of goods shipped to customers in Florida. In that case the seller had "10 wholesalers, jobbers, or 'salesmen' conducting continuous local solicitation in Florida and forwarding the resulting orders

---

[9] Strictly speaking, there is no question of the connection or link between the State and "the person . . . it seeks to tax." For that person in *Miller Bros. Co.* v. *Maryland,* 347 U. S. 340, in *Scripto, Inc.* v. *Carson,* 362 U. S. 207, and in the present case is the user of the goods to whom the out-of-state retailer sells. National is not the person being directly taxed, but rather it is asked to collect the tax from the user. It is, however, made directly liable for the payment of the tax whether collected or not. Ill. Rev. Stat. c. 120, § 439.8 (1965).

[10] National acknowledges its obligation to collect a use tax in Alabama, Kansas, and Mississippi, since it has retail outlets in those States.

from that State to Atlanta for shipment of the ordered goods." 362 U. S., at 211.

But the Court has never held that a State may impose the duty of use tax collection and payment upon a seller whose only connection with customers in the State is by common carrier or the United States mail. Indeed, in the *Sears, Roebuck* case the Court sharply differentiated such a situation from one where the seller had local retail outlets, pointing out that "those other concerns . . . are not receiving benefits from Iowa for which it has the power to exact a price." 312 U. S., at 365. And in *Miller Bros. Co.* v. *Maryland,* 347 U. S. 340, the Court held that Maryland could not constitutionally impose a use tax obligation upon a Delaware seller who had no retail outlets or sales solicitors in Maryland. There the seller advertised its wares to Maryland residents through newspaper and radio advertising, in addition to mailing circulars four times a year. As a result, it made substantial sales to Maryland customers, and made deliveries to them by its own trucks and drivers.

In order to uphold the power of Illinois to impose use tax burdens on National in this case, we would have to repudiate totally the sharp distinction which these and other decisions have drawn between mail order sellers with retail outlets, solicitors, or property within a State, and those who do no more than communicate with customers in the State by mail or common carrier as part of a general interstate business. But this basic distinction, which until now has been generally recognized by the state taxing authorities,[11] is a valid one, and we decline to obliterate it.

---

[11] As of 1965, 11 States besides Illinois had use tax statutes which required a seller like National to participate in the tax collection system. However, state taxing administrators appear to have generally considered an advertising nexus insufficient. For they have testified that doubts as to the constitutionality of such statutes

We need not rest on the broad foundation of all that was said in the *Miller Bros.* opinion, for here there was neither local advertising nor local household deliveries, upon which the dissenters in *Miller Bros.* so largely relied. 347 U. S., at 358. Indeed, it is difficult to conceive of commercial transactions more exclusively interstate in character than the mail order transactions here involved. And if the power of Illinois to impose use tax burdens upon National were upheld, the resulting impediments upon the free conduct of its interstate business would be neither imaginary nor remote. For if Illinois can impose such burdens, so can every other State, and so, indeed, can every municipality, every school district, and every other political subdivision throughout the Nation with power to impose sales and use taxes.[12] The many variations in rates of tax,[13] in allowable exemptions, and in administrative and record-keeping requirements [14] could entangle National's inter-

---

underlay their failure to take full advantage of their statutory authority. Report of the Special Subcommittee on State Taxation of Interstate Commerce of the House Committee on the Judiciary, H. R. Rep. No. 565, 89th Cong., 1st Sess., 631–635 (1965). These doubts were substantiated by the only other State Supreme Court that has considered the issue now before us. The Alabama Supreme Court, dealing with a situation very much like the present one, found that this application of the use tax statute would be invalid under the Federal Constitution. *State* v. *Lane Bryant, Inc.*, 277 Ala. 385, 171 So. 2d 91.

[12] "Local sales taxes are imposed today [1965] by over 2,300 localities. . . . In most States, the local sales tax is complemented by a use tax." H. R. Rep. No. 565, *supra*, at 872.

[13] In 1964 there were seven different rates of sales and use taxes: 2, 2¼, 2½, 3, 3½, 4, and 5%. H. R. Rep. No. 565, *supra*, at 611–613, 607–608. The State of Washington has recently added an eighth, 4.2%. Wash. Rev. Code § 82.12.020 (Supp. 1965).

[14] "The prevailing system requires [the seller] to administer rules which differ from one State to another and whose application—especially for the industrial retailer—turns on facts which are often

state business in a virtual welter of complicated obligations to local jurisdictions with no legitimate claim to impose "a fair share of the cost of the local government."

The very purpose of the Commerce Clause was to ensure a national economy free from such unjustifiable local entanglements. Under the Constitution, this is a domain where Congress alone has the power of regulation and control.[15]

The judgment is *Reversed.*

Mr. JUSTICE FORTAS, with whom Mr. JUSTICE BLACK and Mr. JUSTICE DOUGLAS join, dissenting.

In my opinion, this Court's decision in *Scripto, Inc.* v. *Carson,* 362 U. S. 207 (1960), as well as a realistic approach to the facts of appellant's business, dictates affirmance of the judgment of the Supreme Court of Illinois.

National Bellas Hess is a large retail establishment specializing in wearing apparel. Directly and through subsidiaries, it operates a national retail mail order business with headquarters in North Kansas City, Missouri, and its wholly owned subsidiaries operate a large number of retail stores in various States. In 1961, appellant's net sales were in the neighborhood of

---

too remote and uncertain for the level of accuracy demanded by the prescribed system." H. R. Rep. No. 565, *supra,* at 673.

"Given the broad spread of sales of even small and moderate sized companies, it is clear that if just the localities which now impose the tax were to realize anything like their potential of out-of-State registrants the recordkeeping task of multistate sellers would be clearly intolerable." *Id.,* at 882.

[15] Congress has in fact recently evidenced an active interest in this area. See Tit. II, Pub. L. 86–272, 73 Stat. 556, as amended by Pub. L. 87–17, 75 Stat. 41, which authorized the detailed congressional study of state taxation of interstate commerce that resulted in H. R. Rep. No. 565, *supra.* See also H. R. Rep. No. 2013, 89th Cong., 2d Sess. (1966).

$60,000,000, and its accounts receivable amounted to about $15,500,000.[1]

Its sales in Illinois amounted to $2,174,744 for the approximately 15 months for which the taxes in issue in this case were assessed. This substantial volume is obtained by twice-a-year catalogue mailings, supplemented by "intermediate smaller 'sales books' or 'flyers,'" as the court below styled them. The catalogue contains about 4,000 items of merchandise. The company's mailing list includes over 5,000,000 names. The "flyers" are sent to an even larger list than the catalogues and are occasionally mailed in bulk addressed to "occupant."

A substantial part of Bellas Hess' sales is on credit. Its catalogue features "NBH Budget Aid Credit"—which requires no money down but requires the purchaser to make monthly payments which include a service fee or interest charge, and which also incorporates an agreement, unless expressly rejected by the purchaser, for "Budget Aid Family Insurance." The company also offers "charge account" services—payable monthly including a "service charge" if the account is not fully paid within 30 days. The form to be filled in for credit purchases contains the usual type of information, including place of employment, name of bank, marital status, home ownership or rental. Merchandise can also be bought c. o. d. or by sending a check or money order with the order for goods.[2]

There should be no doubt that this large-scale, systematic, continuous solicitation and exploitation of the Illinois consumer market is a sufficient "nexus" to require Bellas Hess to collect from Illinois customers and to

---

[1] Moody's Industrial Manual (1962).

[2] Because this case was tried on affidavits, reference has also been made to the National Bellas Hess Catalogue, Spring and Summer 1967, to supplement the picture of appellant's business afforded by the record.

remit the use tax, especially when coupled with the use of the credit resources of residents of Illinois, dependent as that mechanism is upon the State's banking and credit institutions. Bellas Hess is not simply using the facilities of interstate commerce to serve customers in Illinois. It is regularly and continuously engaged in "exploitation of the consumer market" of Illinois (*Miller Bros. Co.* v. *Maryland,* 347 U. S. 340, 347 (1954)) by soliciting residents of Illinois who live and work there and have homes and banking connections there, and who, absent the solicitation of Bellas Hess, might buy locally and pay the sales tax to support their State. Bellas Hess could not carry on its business in Illinois, and particularly its substantial credit business, without utilizing Illinois banking and credit facilities. Since the case was tried on affidavits, we are not informed as to the details of the company's credit operations in Illinois. We do not know whether it utilizes credit information or collection agencies, or similar institutions. The company states that it has "brought no suits in the State of Illinois." Accepting this as true, it would nevertheless be unreasonable to assume that the company does not either sell or assign its accounts or otherwise take measures to collect its delinquent accounts, or that collection does not include local activities by the company or its assignees or representatives.

Bellas Hess enjoys the benefits of, and profits from the facilities nurtured by, the State of Illinois as fully as if it were a retail store or maintained salesmen therein. Indeed, if it did either, the benefit that it received from the State of Illinois would be no more than it now has—the ability to make sales of its merchandise, to utilize credit facilities, and to realize a profit; and, at the same time, it would be required to pay additional taxes. Under the present arrangement, it conducts its substantial, regular, and systematic business in Illinois and the State demands

only that it collect from its customer-users—and remit to the State—the use tax which is merely equal to the sales tax which resident merchants must collect and remit. To excuse Bellas Hess from this obligation is to burden and penalize retailers located in Illinois who must collect the sales tax from their customers. In Illinois the rate is $3\frac{1}{2}\%$, and when it is realized that in some communities the sales tax requires, in effect, that as much as 5% be added to the amount that customers of local, tax-paying stores must pay,[3] the importance of the competitive discrimination becomes apparent. While this advantage to out-of-state sellers is tolerable and a necessary constitutional consequence where the sales are occasional, minor and sporadic and not the result of a calculated, systematic exploitation of the market, it certainly should not be extended to instances where the out-of-state company is engaged in exploiting the local market on a regular, systematic, large-scale basis. In such cases, the difference between the nature of the business conducted by the mail order house and by the local enterprise is not entitled to constitutional significance. The national mail order business amounts to over $2,400,000,000 a year.[4] Some of this is undoubtedly subject to the full range of taxes because of the location of stores in the various States,[5] and some of it is and should be exempt from state use tax because of its sporadic or minor nature. See Report of the Special Subcommittee on State Taxation of Interstate Commerce of the House Judiciary Committee, H. R. Rep. No. 565, 89th Cong., 1st Sess.,

---

[3] This is the current rate in Pennsylvania. Pa. Stat. Ann., Tit. 72, § 3403–201 (1964). See The World Almanac (1967, Newspaper Enterprise Assn.) 136–137.

[4] U. S. Bureau of the Census, 1963 Census of Business, Retail Trade-Area Statistics, pt. 1, table 2, p. 1–8 (1966).

[5] See *Nelson* v. *Sears, Roebuck & Co.,* 312 U. S. 359 (1941); *Nelson* v. *Montgomery Ward,* 312 U. S. 373 (1941).

Vol. 3 (1965), at 770–777. But the volume which, under the present decision, will be placed in a favored position and exempted from bearing its fair burden of the collection of state taxes certainly will be substantial, and as state sales taxes increase, this haven of immunity may well increase in size and importance.

In *Scripto, supra,* this Court applied a sensible, practical conception of the Commerce Clause. The interstate seller which, in that case, claimed constitutional immunity from the collection of the Florida use tax had, like appellant here, no office or place of business in the State, and had no property or employees there. It solicited orders in Florida through local "independent contractors" or brokers paid on a commission basis. These brokers were furnished catalogues and samples, and forwarded orders to Scripto, out of state. The Court noted that the seller was "charged with no tax—save when . . . he fails or refuses to collect it" (362 U. S., at 211)[6] and that the State "reimburs[ed the seller] . . . for its service" as tax collector (362 U. S., at 212). The same is true in the present case.[7] I do not see how *Scripto* is

---

[6] Our observation in *Nelson* v. *Sears, Roebuck & Co.,* 312 U. S. 359, 365–366 (1941), is an apt response to appellant's claim that it will not be able to collect all of the tax from its purchasers: "[S]o far as assumed losses on tax collections are concerned, respondent is in no position to found a constitutional right on the practical opportunities for tax avoidance which its method of doing business affords Iowa residents, or to claim a constitutional immunity because it may elect to deliver the goods before the tax is paid." Actually, it appears that appellant's method of doing business is such as to minimize the noncollection of the tax.

[7] The Illinois statute provides for a "discount of 2% or $5 per calendar year, whichever is greater . . . to reimburse the retailer for expenses incurred in collecting the tax, keeping records, preparing and filing returns, remitting the tax and supplying data . . . ." Ill, Rev. Stat. c. 120, § 439.9 (1965). Appellant does not claim that this amount is inadequate to reimburse it for its expenses in collecting the tax for the State.

meaningfully distinguishable from this case. In fact, *Scripto* involved the sale of a single article of commerce. The "exploitation" of the State's market was by no means as pervasive or comprehensive as is here involved, nor was there any reference to the company's use of the State's credit institutions.

The present case is, of course, not at all controlled by *Miller Bros. Co.* v. *Maryland,* 347 U. S. 340 (1954). In that case, as this Court said, the company sold its merchandise at its store in Delaware; there was "no solicitation other than the incidental effects of general advertising . . . no invasion or exploitation of the consumer market . . . ." 347 U. S., at 347. As the Court noted in *Scripto, supra, Miller Bros.* was a case in which there was "no regular, systematic displaying of its products by catalogs, samples or the like." 362 U. S., at 212. On the contrary, in the present case, appellant regularly sends not only its catalogue, but even bulk mailings soliciting business addressed to "occupant," and it offers and extends credit to residents of Illinois based on their local financial references.

As the Court says, the test whether an out-of-state business must comply with a state levy is variously formulated: "whether the state has given anything for which it can ask return"; [8] whether the out-of-state business enjoys the protection or benefits of the State; [9] whether there is a sufficient nexus: "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." [10] However this is formulated, it seems to me entirely clear that a mail order house engaged in the business of regularly, systematically, and on a large scale offering merchandise for sale in a State in competition with local retailers, and

---

[8] *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444 (1940).

[9] *Nelson* v. *Sears, Roebuck & Co.,* 312 U. S. 359, 364 (1941).

[10] *Miller Bros. Co.* v. *Maryland,* 347 U. S. 340, 344–345 (1954).

soliciting deferred-payment credit accounts from the State's residents, is not excused from compliance with the State's use tax obligations by the Commerce Clause or the Due Process Clause of the Constitution.

It is hardly worth remarking that appellant's expressions of consternation and alarm at the burden which the mechanics of compliance with use tax obligations would place upon it and others similarly situated should not give us pause. The burden is no greater than that placed upon local retailers by comparable sales tax obligations; and the Court's response that these administrative and record keeping requirements could "entangle" appellant's interstate business in a welter of complicated obligations vastly underestimates the skill of contemporary man and his machines. There is no doubt that the collection of taxes from consumers is a burden; but it is no more of a burden on a mail order house such as appellant located in another State than on an enterprise in the same State which accepts orders by mail; and it is, indeed, hardly more of a burden than it is on any ordinary retail store in the taxing State.

I would affirm.