ALLEMED, INC., Plaintiff-Appellant, *v*. THE DEPARTMENT OF REVENUE, Defendant-Appellee.

Fourth District   No. 17147

Opinion filed November 13, 1981.

Halfpenny, Hahn & Roche, of Chicago (Richard F. Hahn and James F. Flanagan, of counsel), for appellant.

Tyrone C. Fahner, Attorney General, of Chicago (Patricia Rosen, Assistant Attorney General, of counsel), for appellee.

Mr. JUSTICE MILLS delivered the opinion of the court:

A tax question.

Or—to be more precise—*several* tax questions.

It's a mixed bag—we affirm in part, reverse in part and remand.

Allemed, Inc., is in the business of selling drugs, equipment, supplies, pharmaceuticals, and biologicals to veterinarians. Its headquarters are in Missouri; it has no office, place of business, or stock of goods in Illinois. Allemed has three salesmen who, together, spend approximately 10 man-days per month in Illinois. These salesmen work exclusively for Allemed and cover roughly defined territories. However, most customers place their orders by phone with Allemed's Missouri office rather than with a salesman. Even the few orders that salesmen do write up must be accepted at the Missouri headquarters. Most deliveries are made through common carrier, though Allemed itself delivers some orders.

From June 1974 through November 1977, Allemed paid no Illinois Use Tax or Illinois Service Occupation Tax on its sales to Illinois veterinarians. The Department of Revenue (Department) audited Allemed for that period and issued a notice of tax liability of $69,761.56. At the administrative hearing held on this matter, Allemed's president, Walter Allen, testified that he had previously worked for a similarly operated company, which had paid no Illinois tax on its Illinois sales. Furthermore, Allemed had twice been assured—from both the East St. Louis and the Springfield offices of the Department—that it was not subject to Illinois tax since it had no place of business in Illinois. Allen testified that he thought some kind of tax should be paid and thus collected Missouri sales tax on Allemed's Illinois sales.

Following the hearing, the Department performed a reaudit because it had changed its interpretation of a particular statutory exemption. Thereafter, the Department issued a final assessment of $55,256, consisting of a $34,535 tax delinquency, a $6,907 penalty, and $13,814 interest. Allemed brought an action for administrative review, and the circuit court affirmed the Department's assessment.

## I

Allemed initially contends that the commerce clause of the Federal Constitution precludes Illinois from requiring it to collect its Use Tax and Service Occupation Tax. Use taxes and service occupation taxes are common means used by States to supplement their sales tax schemes. By these taxes, a State attempts to reach goods which have originated in another State but which are purchased by the taxing state's residents for use in the taxing State. Although the consumer is the party taxed, States have sought to simplify administration of these taxes by requiring sellers to collect them. Thus arise problems concerning due process and the commerce clause. See J. Nowak, R. Rotunda & J. Young, Handbook of Constitutional Law 357-61 (1978).

Illinois' taxing scheme recognizes that its Use Tax and Service Occupation Tax cannot be imposed in such a way as to burden interstate commerce. (See Ill. Rev. Stat. 1979, ch. 120, pars. 439.3, 439.103, and 440.) However, the Use Tax is to be collected by any retailer "[h]aving * * * any agent or other representative operating within this State under the authority of the retailer * * * irrespective of whether such * * * agent * * * is located here permanently or temporarily * * *." (Ill. Rev. Stat. 1979, ch. 120, par. 439.2.) Similar coverage is given under the Service Occupation Tax. Ill. Rev. Stat. 1979, ch. 120, par. 439.102.

Our analysis of whether Allemed may constitutionally be made subject to the Illinois Use Tax and Service Occupation Tax must begin with *General Trading Co. v. State Tax Com.* (1944), 322 U.S. 335, 88 L. Ed. 1309, 64 S. Ct. 1028. In that case, the court upheld imposition of the Iowa Use Tax upon a seller which maintained no office, branch, or warehouse in Iowa though it sent traveling salesmen into that State. These salesmen solicited orders, which were subject to acceptance at the seller's Minnesota office. The goods were shipped from Minnesota to the buyer by common carrier. Summarizing the law on the subject, the court said:

"[N]o State can tax the privilege of doing interstate business. [Citation.] That is within the protection of the Commerce Clause and subject to the power of Congress. On the other hand, the mere fact that property is used for interstate commerce or has come into an owner's possession as a result of interstate commerce does not diminish the protection which he may draw from a State to the

upkeep of which he may be asked to bear his fair share." 322 U.S. 335, 338, 88 L. Ed. 1309, 1312, 64 S. Ct. 1028, 1029.

In *Miller Brothers Co. v. Maryland* (1954), 347 U.S. 340, 98 L. Ed. 744, 74 S. Ct. 535, on the other hand, the court held that Maryland could not require a Delaware seller to collect its use tax where the seller maintained a Delaware retail outlet to which Maryland residents came to make purchases. Many purchasers took the goods home from the seller's store; delivery was made to other Maryland buyers by common carrier or by the seller's own truck. The seller's only solicitation in Maryland consisted of general advertising. The court distinguished *General Trading* on the basis of the amount of activity the respective sellers performed in the taxing States and said, "[D]ue process requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." (347 U.S. 340, 344-45, 98 L. Ed. 744, 748, 74 S. Ct. 535, 539.) Although the Maryland buyers were clearly liable for the use tax, there was no jurisdictional basis for requiring the seller to collect that tax.

Also relevant to our inquiry is *Scripto, Inc. v. Carson* (1960), 362 U.S. 207, 4 L. Ed. 2d 660, 80 S. Ct. 619, wherein a Georgia seller had no office, warehouse, or other place of business in Florida, nor did it have a regular employee in that State. Its orders were solicited by 10 residents of Florida who had specific territories and received commissions on orders they took. These people had contracts with Scripto and were referred to as "independent contractors." They did not spend full time soliciting sales for Scripto. Orders were sent to Georgia for acceptance or refusal; no money changed hands between customers and the independent contractors. The court decided that *General Trading* controlled and that the nexus required by *Miller Brothers* between a vendor and a taxing State was present. "The test is simply the nature and extent of the activities of the appellant in Florida." (362 U.S. 207, 211-12, 4 L. Ed. 2d 660, 664, 80 S. Ct. 619, 622.) The court distinguished *Miller Brothers* largely on the fact that there the buyers had gone to the seller's place of business. *Scripto* has been described as representing "the furthest constitutional reach to date of a State's power to deputize an out-of-state retailer as its collection agent for a use tax * * *." *National Bellas Hess, Inc. v. Department of Revenue* (1967), 386 U.S. 753, 757, 18 L. Ed. 2d 505, 509, 87 S. Ct. 1389, 1392.

■■ We conclude that the facts of this case align it with the *General Trading* and *Scripto* cases rather than with *Miller Brothers*. Here, there is the "minimum connection" required by *Miller Brothers*, for Allemed's agents went into Illinois—a factor that the *Scripto* court found determinative. Thus, we hold that the Department has not violated the commerce clause of the Federal Constitution by holding Allemed subject to the Illinois Use Tax and Service Occupation Tax.

## II

Allemed next contends that a certain exemption was not properly applied in assessing its tax delinquency. Section 3 of the Use Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 439.3) provides:

> "A [use] tax is imposed upon the privilege of using in this State tangible personal property, other than *farm chemicals*, purchased at retail from a retailer." (Emphasis added.)

The record in this case indicates that the Department had a difficult time deciding how to interpret the "farm chemicals" exemption. Prior to the hearing, the Department had said that it would not allow exemption of a sale unless the purchasing veterinarian was registered with the Department. In addition, the exemption would apply only if the animals upon which the chemicals were to be used were for resale. Further, horses were not considered farm animals; any chemicals to be used on horses, therefore, would not be regarded as farm chemicals. Allemed was apparently informed of these interpretations prior to the hearing and constructed exhibits that would allow the hearing officer to determine whether various items qualified for the exemption.

At the close of the hearing, however, the hearing officer ruled that the exemption should also apply to sales to unregistered veterinarians. But he said that the exemption would be inapplicable "to chemicals which are not used exclusively for treatment of farm animals." This interpretation of the exemption required the Department to perform a reaudit in order to determine Allemed's tax liability. It is clear from the record that in this reaudit the Department used the labels on chemicals to determine whether they were usable exclusively on farm animals. Counsel in the Department's legal division advised not to allow the exemption "where the labeling does not indicate it is clearly for use in farm animals, even though the supplier might believe that simply by increasing the quantities of a particular chemical or drug, it is possibly used on large farm animals." In addition, the Department decided that horses should be classified as farm animals and that the exemption should apply regardless of whether the animals upon which a chemical would be used were for resale.

The foregoing litany indicates that the Department went into this hearing without first determining what its position should be. Indeed, the only trait that the Department has displayed here with any consistency is its propensity to vacillate. The tragedy of such a practice is that the taxpayer has no reliable guidance in preparing for a hearing—no certainty that he is presenting evidence in a form that ultimately will be usable in making a decision as to his tax liability. The result is that both the Department and the taxpayer must redo much of their work to meet the Department's changing positions. The consequent expense and inefficiency for both parties are obvious. Admittedly, the changes the Depart-

ment made in its position inured to Allemed's benefit. However, there is nothing in the record to indicate that anything that occurred at the hearing caused the Department to change its position. Thus, the Department could have—and should have—made a firm decision, prior to the hearing, of what its interpretation of the farm chemicals exemption would be.

The legislature has not defined "farm chemicals." The Department's Rule 13 under the Retailers' Occupation Tax describes a farm chemical as "any chemical product used ° ° ° in the production or care of animals that are to be sold or the products of which are to be sold." The rule lists various examples: stock sprays, disinfectants, stock tonics, serums, and vaccines. As noted above, the Department finally decided that the exemption applies only if a product's *label* indicates that it is usable *exclusively* on farm animals. Allemed contends that this interpretation is too narrow, given the broad statutory language.

■■ The Department's requirement that a chemical be usable exclusively on farm animals was obviously intended to assure that an exemption would not be allowed for chemicals used on creatures that could not be denominated farm animals: house cats, hamsters, pet mice, parakeets, and boa constrictors. This construction is consistent with the rule that a statutory exemption is to be strictly construed. (*Telco Leasing, Inc. v. Allphin* (1976), 63 Ill. 2d 305, 347 N.E.2d 729; *Heller v. Fergus Ford, Inc.* (1975), 59 Ill. 2d 576, 322 N.E.2d 441.) Admittedly, the exclusivity requirement probably causes the taxpayer to be denied an exemption for particular containers of chemicals which ultimately are used on farm animals. However, the only practical time to determine whether the exemption applies is the time of sale—*i.e.*, when Allemed collects the tax. Since a taxpayer has the burden of clearly showing that he comes within an exemption (*Telco Leasing; Heller*), it is quite reasonable to disallow this exemption for items that possibly will be used on creatures other than farm animals. The requirement that the information be on the product's label would also seem to be a reasonable means of requiring clear proof that the exemption applies.

### III

■■ Allemed also objects to the fact that the reaudit was performed without notice to its attorney and that the Department considered further evidence at that time, thus basing its final assessment on matters not in the record. (See *Smith v. Department of Registration & Education* (1952), 412 Ill. 332, 106 N.E.2d 722.) We agree with the State that Allemed has waived these objections. At the hearing, Allemed's secretary-treasurer, responding to the hearing officer's question, stated that she would be willing to make "backup material" available to the Department in the future if requested. Allemed cannot now contend that the Department should not

have used evidence which Allemed agreed to provide and apparently did provide. The argument that Allemed's *attorney* was unaware of the reaudit and matters relating to it is not a factor which works to Allemed's benefit. (Allemed does not allege a breach of Supreme Court Rule 7—104 (79 Ill. 2d R. 7—104).) Allemed itself clearly knew that the Department was looking into the matter further, and it should have contacted its attorney if further assistance from him was desired. Furthermore, the attorney was present at the hearing and presumably heard the secretary-treasurer's promise to provide other data.

## IV

Allemed next argues that it should have been given a credit for the Missouri sales tax it paid upon sales made to Illinois buyers. Section 3 of the Use Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 439.3) provides:

"To prevent actual or likely multistate taxation, the [use] tax herein imposed does not apply to the use of tangible personal property in this State under the following circumstances:

* * *

(c) the use, in this State, of tangible personal property which is acquired outside this State and caused to be brought into this State by a person who had already paid a tax in another State in respect to the sale, purchase or use of such property, to the extent of the amount of such tax so paid in such other State."

*Philco Corp. v. Department of Revenue* (1968), 40 Ill. 2d 312, 239 N.E.2d 805, indicates that courts are not necessarily to give this provision its strict literal meaning. In that case, Rental Equipment Company, a lessor of heavy construction equipment, leased equipment to lessees for use in Illinois. The equipment was delivered to the lessees at Rental's place of business in Missouri. After deciding the Use Tax was applicable to Rental, the court addressed Rental's contention that it should receive a credit for Missouri sales taxes that its *lessees* had paid upon leasing the equipment.

The Department had denied Rental the credit because the tax had not been *paid by Rental*, as apparently required by the provision quoted above. The court reversed and allowed the credit:

"Under a literal reading of the provision for credit, Rental, which had acquired the property outside this State and caused it to be brought here, was not the 'person who has already paid a tax with respect to the sale, purchase or use of such property * * *.' In our opinion, however, this literal reading of the exemption is not justified. The legislative purpose is to 'prevent actual or likely multistate taxation.' That purpose is not served by an interpretation

that centers upon the identity of the person who makes the payment to the exclusion of the economic effect of the tax. Whether actual payment of the tax levied by another State is made by the buyer or the seller, or by the lessee or the lessor, is not material to the legislative purpose of avoiding multistate taxation.

We hold, therefore, that Rental is entitled to credit for taxes that have been paid elsewhere with respect to the sale or use of the equipment here involved." (40 Ill. 2d 312, 327, 239 N.E.2d 805, 813.)

*Philco* thus obviously mandates a construction of the credit provision that will avoid multistate taxation—without regard for the technical factual requirements that the statute seems to set forth.

The *Philco* court concluded that Rental had acquired the property outside Illinois and had caused it to be brought into Illinois. The same is true of Allemed. In addition, Allemed clearly "has already paid a tax in another state in respect to the sale" of these items. Therefore, it is clear, from the plain wording of the statute, that Allemed qualifies for the credit. We need not even resort to the kind of liberal construction that the *Philco* court adopted.

■■ The Department, however, has attempted to wrest the *Philco* case out of Allemed's grip and use it as a weapon against Allemed. Focusing upon *Philco*'s concern with the "economic effect" of the tax, the Department points out that Allemed is merely the collector of the tax, not the party ultimately liable for it. It is thus apparently the Department's position that since the purchasers are actually the ones liable for the Use Tax, Allemed can require them to reimburse it for any delinquency the Department assesses in this case. (See *Pennwalt Corp. v. Metropolitan Sanitary District* (N.D. Ill. 1973), 368 F. Supp. 972.) Even if we ignore the virtual impossibility of Allemed's collecting a tax from its purchasers at this late date, we must conclude that the Department's position is directly contrary to the *Philco* court's basic concern—that a transaction not be taxed twice. Presumably Allemed has already charged the Missouri sales tax to its Illinois purchasers. Under the Department's position, these purchasers would be taxed again. Neither the credit provision of section 3 nor *Philco* contemplates such a result. The Department's "focus on the person technically liable for payment of the tax is misplaced." *United Air Lines, Inc. v. Mahin* (1979), 79 Ill. App. 3d 1004, 1006, 398 N.E.2d 1064, 1066, *rev'd on other grounds sub nom. United Air Lines, Inc. v. Johnson* (1981), 84 Ill. 2d 446, 419 N.E.2d 899.

Allemed is entitled to the credit for Missouri taxes.

## V

■■ Pursuant to section 5 of the Retailers' Occupation Tax Act (Ill. Rev.

Stat. 1979, ch. 120, par. 444), which is applicable to the Use Tax and Service Occupation Tax (Ill. Rev. Stat. 1979, ch. 120, pars. 439.12 and 439.112), the Department assessed a penalty against Allemed of 20 percent of its tax liability because of its failure to file a return. Allemed argues that the penalty should not have been applied because it was acting in good faith in not paying the Illinois taxes. Courts have said that there is no "good faith" exception to this penalty provision. *Columbia Quarry Co. v. Department of Revenue* (1968), 40 Ill. 2d 47, 237 N.E.2d 525; *Miller Brewing Co. v. Korshak* (1966), 35 Ill. 2d 86, 219 N.E.2d 494, *appeal dismissed* (1967), 386 U.S. 684, 18 L. Ed. 2d 405, 87 S. Ct. 1325.

We agree with Allemed, however, that no penalty should be assessed. It is manifest from the record that Allemed was trying to do what was right. Both because of previous experience in the same type of business and because of assurances from the Department's own offices, Allemed decided that it should not collect Illinois taxes. But thinking that a tax-free transaction was improper, it collected Missouri sales taxes. The record also indicates that Allemed fully cooperated with the Department at every juncture—in spite of the Department's inability to decide upon its own position. The Department's conduct during this case, on the other hand, has been much less than what Allemed in particular, or the citizens of the State of Illinois in general, are entitled to expect from it. Under these circumstances, we hold that the Department could not equitably and in good conscience assess a penalty against Allemed.

In sum, we affirm the Department's decision that Allemed is subject to the Illinois Use Tax and Service Occupation Tax and its decision as to the items which qualify as farm chemicals. However, we reverse its decision disallowing credit for Missouri sales taxes paid on Illinois sales and its assessment of a penalty, and we remand this case to the Department for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

GREEN and WEBBER, JJ., concur.