834 A.2d 515

**McNEIL–PPC, INC., Appellant**

v.

**COMMONWEALTH of Pennsylvania, Appellee.**

Supreme Court of Pennsylvania.

Argued May 13, 2003.

Decided Oct. 22, 2003.

Kyle Oliver Sollie, Lee Allen Zoeller, Philadelphia, for McNeil–PPC, Inc., Appellant.

Ronald H. Skubecz, Harrisburg, for the Com. of PA, Appellee.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Justice NEWMAN.

McNeil–PPC, Inc. (McNeil) appeals from an Order of the Commonwealth Court, denying exceptions McNeil filed to a previous Order of the Commonwealth Court, which affirmed an Order of the Board of Finance and Revenue (BFR) refusing that portion of McNeil's petition for review of a reassessment of sales and use tax that it paid directly to vendors on non-taxable purchases. For the reasons that follow, we reverse the Order of the Commonwealth Court and hold that an audit requires the Department of Revenue (Department) to correct both underpayments and overpayments of tax for the audit period.

### FACTS AND PROCEDURAL HISTORY

The parties stipulated to the facts as recounted herein. McNeil is a New Jersey corporation with its principal place of business located in Fort Washington, Pennsylvania. McNeil is a pharmaceutical company that manufactures and markets analgesic drugs, such as Tylenol. On November 9, 1994, the Department advised McNeil that it intended to conduct a sales and use tax[1] audit of McNeil's records and accounts for purposes of determining the amount of tax due for the period from October 1, 1991 through December 31, 1994 (audit period). McNeil made approximately 780,000 purchases related to its pharmaceutical business during the audit period; the auditor reviewed all of these purchases. The auditor "advised McNeil's representative at the start of the audit that any tax paid on non-taxable purchases during the audit period would

---

1. Section 202(a) of the Tax Reform Code of 1971 (Code), March 4, P.L. 6, *as amended*, 72 P.S. § 7202(a) explains that a "sales tax" is imposed on each separate sale at retail of tangible personal property and certain services. 72 P.S. § 7202(a). A "use tax" is imposed on the use of items and services purchased at retail and where sales tax has not been paid. 72 P.S. § 7202(b).

reduce any amount of tax determined by the auditor to be due for the audit period." (Reproduced Record (R.R.) at 2, Stipulation of Facts No. 5). Based on requests by the Department, McNeil twice agreed to extend the deadline for the Department to complete the audit; it is common practice for the Department to make such requests of taxpayers with large volumes of purchases.

During the pendency of the audit, to stop the accrual of interest, McNeil paid $1,599,975.99 to the Department to offset the deficiency that it anticipated the audit would uncover. On June 25, 1996, the Department mailed an assessment notice to McNeil advising the company that it owed $3,533,254.77 for the audit period. Taking into account the anticipatory pre-payment of $1,599,975.99, the Department informed McNeil that it had $1,933,278.78 in outstanding tax liability. McNeil did not advise the auditor of the tax that McNeil paid directly to its vendors on non-taxable purchases, relying on the statement of the auditor that the audit would incorporate overpayments; the auditor did not reduce his determination of the amount of tax due by the amount of these overpayments.

On August 9, 1996, McNeil filed a Petition for Reassessment with the Board of Appeals for the Department, challenging the entire amount of tax, the auditor determined was due for the audit period. The Board of Appeals reassessed McNeil's tax liability and reduced it by $43,479.04 based on certain purchases included by the auditor, which the Board of Appeals deemed exempt from tax. Accordingly, the Board of Appeals set McNeil's liability for the audit period at $3,489,775.73, which, after subtraction of the anticipatory pre-payment, left McNeil with a $1,899,799.74 outstanding deficiency.

On October 6, 1997, McNeil appealed the Board of Appeals' reassessment by filing a Petition for Review with the Board of Finance and Revenue (BFR). On November 12, 1997, McNeil amended its appeal and submitted evidence that it paid tax to its vendors on certain non-taxable purchases it made during the audit period. McNeil requested that the tax paid on those non-taxable purchases reduce the amount of tax due for the

audit period. In its amended appeal, McNeil explained its position that the "assessment must be offset by overpayments for the audit period because [*inter alia*] ... the sales tax statute requires that the Department determine the proper amount of tax due for the audit period, which necessarily includes considering tax overpayments." (Reproduced Record at Exhibit A, page 1).

The BFR rejected the request of McNeil as untimely, citing then-applicable Section 253(a) of the Tax Code, which provided that "[a] refund or credit of tax ... shall be made only where the person who has actually paid the tax files with the Department a petition for refund **within three years** of the actual payment of the tax to the Commonwealth...." 72 P.S. § 7253(a) (emphasis added). The BFR determined that McNeil filed a timely challenge relevant to overpayments where the purchases were made within three years of the date of the amended appeal; therefore, the BFR indicated that it would consider tax payments McNeil made directly to vendors on non-taxable purchases from November 12, 1994 through December 31, 1994. However, because McNeil failed to list purchases on which it paid tax directly to vendors by invoice or payment dates, the BFR could not determine the taxes that were paid after November 12, 1994. Thus, the BFR could not grant relief to McNeil based on any tax paid to vendors on non-taxable purchases. Nevertheless, the BFR did grant McNeil relief on some of the individual purchases, determining that the taxpayer was entitled to some exemptions and exclusions that neither the auditor nor the Board of Appeals granted. Applying these exemptions and exclusions, the BFR reduced the determination of tax due for the audit period to $2,565,514.13, thereby reducing McNeil's outstanding liability to $965,538.14 (taking into account the anticipatory pre-payment). Two of the six members of the BFR dissented in favor of affording greater relief to McNeil.

On April 21, 1998, McNeil filed a timely Petition for Review with the Commonwealth Court.[2] In a Memorandum Opinion,

**2.** While the Commonwealth Court was in the process of deciding the issues raised by McNeil in its Petition for Review, the Department

the Commonwealth Court affirmed the Order of the BFR. The panel rejected the argument of McNeil that the act of auditing requires the Department to determine the proper amount of tax due during the audit period, which, according to McNeil, necessarily includes consideration of tax paid on non-taxable purchases. The panel agreed with the BFR that the failure of McNeil to file a refund claim within three years of the alleged overpayments rendered the refund request untimely. Judge Leadbetter dissented from the panel decision without opinion. Pursuant to Pennsylvania Rule of Appellate Procedure 1571(i), McNeil filed exceptions to the Order of the Commonwealth Court.

In a published, *en banc* opinion, the Commonwealth Court denied the exceptions filed by McNeil. The court determined that "McNeil should have been sufficiently familiar with statutory requirements to know that it had to file a petition for a refund of its sales tax overpayments within the appropriate time period." *McNeil–PPC, Inc. v. Commonwealth,* 802 A.2d 26, 31 (Pa.Cmwlth.2002) *(en banc).* Therefore, because McNeil failed to file a timely request for a refund of overpayments, the Commonwealth Court held that it (and for that matter, the Department itself) had no means by which to grant a credit to McNeil. Again, Judge Leadbetter dissented without opinion.

## DISCUSSION

This case asks us to consider the proper scope of an audit as well as the relationship between the sales tax and the use tax. Specifically, we must answer the following questions: (1) where the Department conducts an audit of a taxpayer, must the Department grant credits for overpayments as well as assess deficiencies for underpayments when the taxpayer has not specifically requested a refund for overpayments; and (2) assuming the answer to the first question is "yes," if the Department conducts a **use tax** audit, must the Department

agreed to further reduce the deficiency that the BFR assessed by $1 million. This reduction is not germane to the issues presented in the instant appeal.

grant credits for **sales tax** overpayments? These questions are so inextricably intertwined, however, that we discuss them in tandem. As a preliminary matter, we note that because this case involves questions of law, our review is plenary. *PPG Industries v. Commonwealth, Board of Finance and Revenue*, 567 Pa. 580, 790 A.2d 261, 266 (2001).

Section 231(b) of the Code provides in relevant part that where the Department "determines that any return . . . of any taxpayer understates the amount of tax due, it shall **determine the proper amount** and shall ascertain the difference between the amount of tax shown in the return and the amount determined, such difference being hereafter sometimes referred to as the 'deficiency.'" 72 P.S. § 7231(b) (emphasis added). To determine the proper amount of tax due, McNeil posits, the Department must ascertain for each purchase made during the audit period: (1) whether McNeil paid tax; and (2) whether McNeil was required to pay tax. For taxable purchases for which McNeil did not pay tax, the Department should assess tax liability, and from that amount, McNeil contends, the Department should subtract the tax McNeil paid on non-taxable purchases. The amount remaining is the deficiency, according to McNeil.

McNeil was dissatisfied with the deficiency assessed, so it filed a Petition for Reassessment, pursuant to Section 232 of the Code, challenging the Department's failure to offset tax owed on taxable purchases by tax paid on non-taxable purchases. Section 232 provides in relevant part as follows:

> Any taxpayer against whom an assessment is made may petition the department for a reassessment. . . . A petition for reassessment shall thereafter be filed within thirty days after such basis of assessment has been mailed to the taxpayer. Such petition shall set forth in reasonable detail the grounds upon which the taxpayer claims that the assessment is erroneous or unlawful, in whole or in part, and shall be accompanied by an affidavit or affirmation that the facts contained therein are true and correct and that the petition is not interposed for delay.

72 P.S. § 7232. McNeil submits that filing a Petition for Reassessment was sufficient to continue its challenge to the deficiency assessed by the Department.

The Commonwealth concedes that McNeil complied with the dictates of Section 232 for seeking a reassessment of the deficiency. However, the Commonwealth asserts that McNeil's Petition for Reassessment operated as a challenge only to the specific **use tax** deficiencies uncovered by the auditor. The Commonwealth maintains that McNeil had to file a separate refund petition for a credit of **sales tax** it paid to vendors in order to be entitled to a credit for "taxes, interest and penalties paid to the Commonwealth ... to which the Commonwealth is not rightfully entitled." 72 P.S. § 7252. Because McNeil failed to file a refund petition within three years of the non-taxable purchases on which it allegedly paid tax to vendors, the Commonwealth contends that McNeil is not entitled to use those overpayments to reduce its deficiency as determined by the audit.[3] McNeil counters that it did not file a Petition for Refund because the auditor told it that the audit would grant it a credit for the amount of overpayments made during the audit period.

 Section 202 of the Code, entitled "Imposition of Tax,"[4] sets forth provisions to tax either the sale at retail of tangible personal property, subject to certain exclusions, or

3. McNeil filed a petition for refund on November 12, 1997, which would operate as a timely refund request for purchases it made from November 12, 1994 until December 31, 1994. However, the BFR determined that McNeil would not be entitled to a refund of tax paid to vendors on non-taxable purchases during this period because the petition filed by McNeil did not set forth with sufficient specificity exactly which purchases occurred during that window. McNeil does not contest this aspect of the decision of the BFR. The parties have stipulated that, if we decide that McNeil was required to file a refund petition for non-taxable purchases on which it paid sales tax to vendors, the amount of the deficiency determined by the BFR stands, subject to the $1 million settlement discussed at note 2, *supra*. (Reproduced Record at 5–6, Stipulation of Facts No. 19).

4. 1 Pa.C.S. § 1924 provides in relevant part that "[t]he headings prefixed to titles, parts, articles, chapters, sections and other divisions of a statute shall not be considered to control but may be used to aid in the construction thereof."

the use of tangible personal property purchased at retail, again subject to exclusions, where the taxpayer did not pay tax to the vendor. 72 P.S. § 7202. "As the name suggests, the Sales and Use Tax is nominally two taxes.... The taxes, however, are not duplicative; the Use Tax is imposed only on the use of items purchased at retail with respect to which Sales Tax has not been paid." 26 Summ. Pa. Jur.2d § 7.2, pages 7–6 to 7–7 (updated 12–1998). The sales tax and the use tax serve the same purpose and are designed to operate in tandem to ensure that the Department ultimately receives the proper amount of tax on all taxable items, whether the vendor collects the tax and forwards it to the Department or, alternatively, the Department itself collects the tax from the purchaser.

Pennsylvania cannot require an out-of-state vendor to collect tax from a Pennsylvania purchaser. *See National Bellas Hess, Inc. v. Department of Revenue of Illinois,* 386 U.S. 753, 758–759, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967), *overruled on other grounds by Quill Corp. v. North Dakota By and Through Heitkamp,* 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). Pennsylvania can, however, collect tax directly from the Pennsylvania purchaser. *See Henneford v. Silas Mason Co.,* 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937). Simply stated, where an in-state vendor sells to an in-state purchaser, the vendor must collect any applicable tax (sales tax) from the purchaser and remit it to the Department. Where an out-of-state vendor sells to an in-state purchaser, the in-state purchaser does not pay tax to the vendor but, rather, remits the applicable tax (use tax) directly to the Department.

The lodestar principle of taxation in the federal sense is equality—so as not to burden interstate commerce, the tax paid to a state by resident purchasers should be the same whether or not the vendor is in state. In *Henneford,* the U.S. Supreme Court upheld a Washington state taxing scheme that imposed a tax upon the use of items purchased at retail where there was an offset for use or sales tax already paid for the same items. "No one who uses property in Washington after

buying it at retail is to be exempt from a tax upon the privilege of enjoyment except to the extent that he has paid a use or sales tax somewhere. Every one who has paid a use or sales tax ... in any state, is to that extent to be exempt from the payment of another tax in Washington." *Henneford*, 300 U.S. at 584, 57 S.Ct. 524. The Supreme Court explained as follows:

> When the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed. Equality exists when the chattel subjected to the use tax is bought in another state and then carried into Washington. It exists when the imported chattel is shipped from the state of origin under an order received directly from the state of destination. In each situation the burden borne by the owner is balanced by an equal burden where the sale is strictly local. 'There is no demand in (the) Constitution that the state shall put its requirements in any one statute. It may distribute them as it sees fit, if the result, taken in its totality, is within the state's constitutional power.'
>
> If the sales tax were abolished, the buyer in Washington would pay at once upon the use. He would have no longer an offsetting credit. While the sales tax is in force, he pays upon the sale, and pays at the same rate. For the owner who uses after buying from afar the effect is all one whether his competitor is taxable under one title or another. This common sense conclusion has ample precedent behind it.

*Id.* at 584–585, 57 S.Ct. 524 (quoting *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 480, 52 S.Ct. 631, 76 L.Ed. 1232 (1932); citing *Hinson v. Lott*, 8 Wall. 148, 75 U.S. 148, 19 L.Ed. 387 (1868), and *General American Tank Car Corp. v. Day*, 270 U.S. 367, 46 S.Ct. 234, 70 L.Ed. 635 (1926)).

In the case *sub judice*, McNeil paid sales tax on purchases where sales tax was not due during the audit period and failed to pay use tax on some purchases where use tax was due. For some of the transactions where McNeil paid sales tax to the

vendor, it instead should have paid use tax to the Common-wealth. The parties stipulated that McNeil was subject to a "sales and use tax (tax) audit" and that the auditor assigned to McNeil informed a representative of the taxpayer that "any **tax paid** on non-taxable **purchases** during the audit period would reduce **any amount of tax determined** by the auditor to be due for the audit period." (R.R. at 2, Stipulation of Facts Nos. 3 and 5) (emphasis added). The clear inclination of the taxing scheme and the principles of equality in taxation articulated in *Henneford* are to ensure that each purchase at retail for which the taxpayer is not exempt from paying tax should result in the payment of the appropriate percentage of tax (either six percent or seven percent, depending upon geography) once.

■ The only way to ensure that a taxpayer is not taxed twice for the same purchase is to review each transaction (subject to applicable sampling procedures) to determine whether tax is due and, if so, whether tax was paid. The taxing statute makes a distinction between the payment of sales tax and the payment of use tax because the taxes are paid to different entities, but the result is the same whether the purchaser or the vendor ultimately remits the tax to the Commonwealth. Accordingly, an audit conducted pursuant to the Sales and Use Tax, 72 P.S. § 7201, *et seq.*, cannot focus on sales tax to the exclusion of use tax and cannot focus on use tax to the exclusion of sales tax.

■ Having determined that the sales tax and use tax should be treated in tandem, we now turn to the ultimate question in this case—whether an assessment following an audit must take into account overpayments of tax as well as underpayments of tax. Section 231(b) of the Code, quoted above, provides that, where the Department finds that the tax return of a taxpayer "understate[d] the **amount of tax** due, it shall determine the **proper amount**" of tax due and assess a deficiency accordingly. 72 P.S. § 7231(b) (emphasis added). The language of Section 231(b) speaks to the propriety of an audit where the Department uncovers an understatement of

tax due on a tax return. We refer to the following example to clarify the dispute *sub judice*. Assume that A has paid $600 in taxes for purchases made during year 1. The Department finds that A has not paid enough tax for year 1, so it conducts an audit of all of A's purchases for that year. The Department ultimately determines that A should have paid taxes totaling $3,000 on purchases for which it has not paid tax, but that A owed only $200 in taxes for the purchases made for which A paid tax. The Department wants to assess a deficiency of $3,000 and require A to seek a timely refund for the $400 in overpayments; A contends that it should have paid $3,200, but paid only $600, so it owes $2,600. We cannot accept the position of the Department.

The Department does not notify the taxpayer of, and conduct, an individual audit on each purchase for which there is an apparent deficiency. Rather, the Department is charged with the responsibility of examining all of the purchases and concluding whether there is an overall deficiency. If the Department were to separately notify the taxpayer of each individual deficiency, presumably it would conduct an audit only of those specific underpayments. However, in this case, the Department stipulated that it conducted a solitary audit of the entire audit period.

In *Commonwealth v. Sperry Rand Corp.*, 88 Dauph. 354 (1968),[5] the taxpayer filed a refund petition to recover tax overpayments that it had made in the previous eighteen months (at the time, the time limit for filing a refund request was eighteen months). The Commonwealth sought to offset those overpayments with a deficiency that it uncovered that had occurred outside of the eighteen-month refund period, but within the three-year period for the Department to conduct an audit. The taxpayer then sought to offset that deficiency by the amount of overpayments it made outside of the eighteen-month refund period but within the three-year audit period. The court ultimately assessed a deficiency against the taxpay-

5. Prior to the advent of the Commonwealth Court, the Court of Common Pleas of Dauphin County heard all appeals from decisions of the Board of Finance and Revenue.

er that took into account overpayments for the entire three-year audit period, even though the taxpayer did not file a timely refund petition for some of the overpayments. *See also Commonwealth v. Penn Fruit Co., Inc.,* 78 Dauph. 300 (1962) (when taxpayer appealed audit assessment, court reduced assessment amount by amount of overpayments, even though taxpayer never filed a refund request).

*Sperry Rand* stands for the proposition that a taxpayer does not have to file a timely refund request for overpayments that occurred during an audit period. Rather, when conducting an audit, the Department has the responsibility to determine the "proper amount" of tax due for the entire period, which includes uncovering both underpayments and overpayments. Therefore, the Commonwealth Court erred in determining that McNeil's failure to petition for a refund of overpayments pursuant to Section 252 of the Code, 72 P.S. § 7252, barred its assessment from being reduced by the amount of its overpayment to the Department.

Moreover, "[a] taxing statute must be construed most strongly and strictly against the government, and if there is a reasonable doubt as to its construction or application to a particular case, the doubt must be resolved in favor of the taxpayer." *Skepton v. Borough of Wilson,* 562 Pa. 344, 755 A.2d 1267, 1270 (2000) (quoting *Commonwealth v. High Welding Co.,* 428 Pa. 545, 239 A.2d 377, 379 (1968)). Thus, even if we were to discern some ambiguity in Section 231, the principles of statutory interpretation would require this Court to construe the audit provisions in favor of McNeil.

The position of McNeil is not only more consistent with the language of the statute, but it also gives appropriate effect to the common understanding of an audit. The purpose of an audit is not to collect more tax—it is to ascertain the amount of tax that the taxpayer should have paid and to require the taxpayer to correct its payment. It would be unfair to allow the Department to assess a deficiency for underpaid transactions but not allow the taxpayer to point to overpaid transactions, also covered by the same audit, to reduce the deficiency.

The construction that the Department advocates leads to a potential windfall for the government, at the expense of the individual taxpayer, a result that we cannot approve.

## CONCLUSION

We reverse the Order of the Commonwealth Court and conclude that McNeil is entitled to a credit for overpayments of sales and use tax during the audit period. Once a taxpayer is audited, it doesn't have to seek a refund for overpayments during the audit period because it is the duty of the auditor to ensure that the proper amount of tax was collected, which necessarily requires that the audit take into account situations where the taxpayer overpaid tax or paid tax where it did not have to during the audit period. Pursuant to Stipulation of Facts No. 20 (R.R. at 6), we Order the following:

(1) The tax of $977,120.31 that McNeil paid on non-taxable purchases during the audit period reduces the amount of the tax deficiency assessed for the audit period to $588,394.12.

(2) When the payments totaling $1,599,975.99 made by McNeil in anticipation of a tax deficiency are taken into account, McNeil is entitled to a credit balance of $1,011,581.87 for the audit period, plus statutory interest.