932 A.2d 748

**AT&T COMMUNICATIONS OF MARYLAND, INC.**

**v.**

**COMPTROLLER OF THE TREASURY.**

**No. 1883, Sept. Term, 2005.**

Court of Special Appeals of Maryland.

Sept. 13, 2007.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Paul Walter (William C. Sammons, Toyja E. Kelley, on brief), Baltimore, for appellant.

John K. Barry (J. Joseph Curran, Jr., Gerald Langbaum, on brief), Annapolis, for appellee.

Panel: SALMON, DEBORAH S. EYLER, and MEREDITH, JJ.

MEREDITH, J.

AT&T Communications of Maryland, Inc., appeals the decision of the Circuit Court for Baltimore City that affirmed a decision of the Maryland Tax Court. The tax court, in turn, had affirmed a decision of the Comptroller of the Treasury, appellee, to assess AT&T $5,160,899.45, plus interest, for unpaid sales tax based upon sales of "900 telecommunication services." The tax court held that AT&T is liable for the tax because AT&T failed to collect the tax from the consumers and remit it to the State.[1] We hold that AT&T is liable for the sales tax because AT&T was (a) not merely a "common carrier" of the 900 service, and (b) was a jointly-responsible agent of the out-of-state vendors.

Accordingly, we affirm the decision of the circuit court.

### Facts and Procedural History

The Maryland sales tax is an excise tax imposed on a retail sale or "a use, in the state, of . . . a taxable service." Maryland Code (2002, 2004 Repl.Vol.), Tax–General Article ("TG"), § 11–102. In 1992, the Maryland General Assembly amended the sales and use tax statute, TG §§ 11–101–11–712, to impose a sales tax on several "telecommunication services." The definition of "taxable services" was amended to include " '900'; '976'; '915' and other '900'-type telecommunication services. . . . " TG § 11–101(m)(5).

The area code "900" is assigned by the Federal Communications Commission, and reflects the type of call being made (one to purchase information or services), rather than the

---

1. AT&T presents the following issues for our review:

   I.  Whether the Legislature may impose a sales tax on a telecommunications common carrier on account of sales made by an out-of-state vendor over the common carrier's telecommunication system.

   II.  Whether the Tax Court erred in imposing sales tax liability on AT&T as an agent of an out-of-state vendor when AT&T met none of the statutory criteria for such an agency.

   III.  Whether the Tax Court erred in imposing sales tax liability on AT&T as a retail vendor when AT&T neither sold nor delivered the service identified by the Tax Court as the taxable service.

geographic location of the recipient of the call. Telephone calls made to numbers with the area code 900 allow consumers to purchase information or services over the telephone for a fee. To complete a 900 number transaction, the caller dials the ten-digit telephone number beginning with "900" and is connected to an information or content provider who then provides the desired information, such as psychic readings, sports scores, weather information, "date lines," etc.

There are four main participants in a 900 number transaction: (1) the information or content provider, (2) the local exchange carrier, (3) the long-distance carrier, and (4) the purchasing caller. The content provider develops the information or services and determines the amount to charge the caller. The content provider then contracts with either a long-distance carrier (*e.g.*, AT&T) or a local exchange carrier (*e.g.*, Verizon) for the telecommunication services needed to provide the 900 number service. AT&T is a long-distance telephone carrier licensed to transmit 900 number and long distance telephone calls.

AT&T entered into contracts with various content providers who were AT&T's customers located outside Maryland. The contracts stated: "acting as Customer's agent AT&T will perform the following services...." Pursuant to such contracts, AT&T: (a) assigned 900 numbers to the content providers; (b) reviewed the content providers' advertisements and preambles that the callers would receive over the phone, as well as message content; (c) transported the message over part of its network; (d) provided dispute resolution services; and (e) provided billing and collection services for a majority of the content providers. Some of the above functions performed by AT&T were required by federal statutes and regulations, some were required by the local exchange carriers, and some were required by AT&T's own policies.

The 900 number calls that were alleged to be taxable here originated in Maryland, and the calls were charged to a service address in Maryland. On May 17, 2001, the Maryland Comptroller of the Treasury completed an audit, and assessed

AT&T with sales and use tax in the amount of $5,160,899.45, plus interest, for "900 telecommunication services" conducted over AT&T's network from January 1, 1992, through February 28, 2001 (the audit period). AT&T applied for a revision of the assessment, arguing that it was not a "vendor" responsible for collecting and remitting the tax under the statute, and that the out-of-state information providers were the responsible vendors.

On July 12, 2001, a hearing was held before the Comptroller. The Comptroller denied AT&T's application for revision, and affirmed the assessment, determining that AT&T was a "co-vendor of 900 telecommunication services along with the information providers, and, therefore, liable for remitting sales tax." AT&T appealed the Comptroller's decision to the Maryland Tax Court.

On March 17 and 18, 2004, a hearing was held before the tax court. On January 3, 2005, the tax court issued an order affirming the assessment and finding AT&T liable for the tax on the 900 service. AT&T petitioned for judicial review of that decision in the Circuit Court for Baltimore City. On September 30, 2005, the circuit court filed a memorandum opinion and order affirming the tax court. On October 19, 2005, AT&T noted an appeal from the circuit court's order.

### Standard of Review

Despite its name, the Maryland Tax Court is an administrative agency and not a judicial body. *Harford County v. Saks Fifth Avenue Distribution Co.*, 399 Md. 73, 88 n. 4, 923 A.2d 1 (2007). Accordingly, a decision of the tax court is accorded great deference. *Bennett v. State Dept. of Assessments And Taxation*, 171 Md.App. 197, 204, 908 A.2d 759 (2006). We review the tax court's decision in a light most favorable to the agency, and will affirm the decision if it "is not erroneous as a matter of law and is supported by substantial evidence appearing in the record." *Id.* (citations omitted). *See Comptroller of the Treasury v. Blanton*, 390 Md. 528, 535, 890 A.2d 279 (2006) ("Unless the Tax Court's decision was erroneous as a matter of law, or its conclusion was not

supported by substantial evidence, we must affirm the decision.").

An administrative agency's factual findings are binding upon a reviewing court, so long as they are supported by "substantial evidence" in the record. *United Parcel Serv., Inc. v. People's Counsel*, 336 Md. 569, 577, 650 A.2d 226 (1994). A reviewing court may not engage in judicial fact-finding. *Marsheck v. Board of Trustees of Fire & Police Employees' Retirement System of City of Baltimore*, 358 Md. 393, 402, 749 A.2d 774 (2000); *Motor Vehicle Administration v. Karwacki*, 340 Md. 271, 283, 666 A.2d 511 (1995); *Anderson v. Dep't of Public Safety*, 330 Md. 187, 212, 623 A.2d 198 (1993). In this context, substantial evidence has been defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]' " *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512, 390 A.2d 1119 (1978) (quoting *Snowden v. Mayor of Baltimore*, 224 Md. 443, 448, 168 A.2d 390 (1961)).

Although we do not yield to the agency's legal conclusions, "a degree of deference" is nevertheless accorded to the expertise of administrative agencies, even with regard to some legal issues. *Maryland Aviation Administration v. Noland*, 386 Md. 556, 571–72, 873 A.2d 1145 (2005). In *Noland*, the Court of Appeals stated that the reviewing court must review the agency's decision in the light most favorable to it and that the agency's decision is prima facie correct and presumed valid. *Id.* at 571, 873 A.2d 1145; *see also Catonsville Nursing v. Loveman*, 349 Md. 560, 569, 709 A.2d 749 (1998); *CBS v. Comptroller*, 319 Md. 687, 698, 575 A.2d 324 (1990); *Ramsay, Scarlett & Co., v. Comptroller*, 302 Md. 825, 834–835, 490 A.2d 1296 (1985).

## Discussion

### I.  AT&T is not merely a common carrier for the 900 service

AT&T argues that it merely acted as a "common carrier" for the 900 number service because it only provided "transport

services" for the out-of-state content providers, and it did not sell any information or services to Maryland consumers. AT&T maintains that, as such a common carrier, it does not have the necessary ties to Maryland to be taxed for providing the 900 service. We agree, however, with the tax court's determination that AT&T is jointly liable with the out-of-state vendors for the sales tax, because, in this case, AT&T's function exceeded that of a common carrier with regard to the 900 service.[2]

The sales and use tax statute provides that a "vendor" is obligated to collect the tax from the buyer, and the buyer is obligated either to pay the tax to the vendor, or directly to the Comptroller. TG § 11–401(a). *See Comptroller of Treasury v. American Cyanamid Co.*, 240 Md. 491, 494, 214 A.2d 596 (1965) (the sales tax is intended to be paid by the ultimate consumer, and collected from the consumer by the vendor). A vendor is defined in the statute as a person who:

---

**2.** Even if AT&T were correct in its argument that it acted as a common carrier in the 900 service transactions, the appellant nevertheless has a physical presence in, and sufficient ties with, Maryland to be subject to state tax. As the tax court correctly stated, AT&T has "many connections, including payroll and property, with the State," creating a sufficient nexus to allow Maryland to collect a sales tax. Moreover, the Supreme Court has explicitly approved excise tax collection responsibilities for telephone companies when the call, as in the present case, originates in the taxing state. *See Goldberg v. Sweet*, 488 U.S. 252, 263, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989) (telephone company can be required to collect excise tax determined as a percentage of amount billed to consumer, where tax is imposed on calls originating from the taxing state or billed to an address in the taxing state). As in *Goldberg*, the 900 number calls here originated in the taxing state, and the calls were charged to service addresses in the taxing state.

The Comptroller further contends that, even if AT&T is a common carrier, no language in the statute states or implies that common carriers that deliver a service are exempt from collecting sales tax. The Comptroller argues that, because the legislature knew that telephone companies are common carriers that deliver the 900 service, no additional language is necessary to bring them within the ambit of the statute. Because we agree with the tax court's finding that AT&T's services in these transactions went beyond the scope of a common carrier, we need not decide whether the Comptroller is correct in this alternative argument.

(1)(i) engages in the business of an out-of-state vendor, as defined in § 11–701 [ (b) [3]] of this title;

(ii) engages in the business of a retail vendor, as defined in § 11–701 [ (c) [4]] of this title; or

(iii) holds a special license issued under § 11–707 of this title.

(2) **"Vendor" includes, for an out-of-state vendor, a** salesman, **representative,** peddler, or canvasser **whom the Comptroller,** for the efficient administration of this title, **elects to treat as an agent jointly responsible with the dealer,** distributor, employer, or supervisor:

(i) under whom the agent operates; or

(ii) from whom the agent obtains the tangible personal property or taxable service for sale.

TG § 11–101(o)(1) and (2) (emphasis added).

AT&T itself cannot be an "out-of-state vendor" of the 900 service because AT&T has locations in and does business in Maryland. The Comptroller argues, however, that, pursuant

---

**3.** TG § 11–701(b) provides:

(1) "Engage in the business of an out-of-state vendor" means to sell or **deliver** tangible personal property or **a taxable service for use in the State.**

(2) "Engage in the business of an out-of-state vendor" includes:

(i) permanently or temporarily maintaining, occupying, or using any office, sales or sample room, or distribution, storage, warehouse, or other place for the sale of tangible personal property or a taxable service directly or indirectly through an agent or subsidiary;

(ii) **having an agent,** canvasser, representative, salesman, or solicitor **operating in the State for the purpose of delivering,** selling, or taking orders for tangible personal property or a **taxable service;** or

(iii) entering the State on a regular basis to provide service or repair for tangible personal property.

(Emphasis added.)

**4.** TG § 11–701(c) provides:

(1) "Engage in the business of a retail vendor" means to sell or **deliver** tangible personal property or **a taxable service in the State.**

(2) "Engage in the business of a retail vendor" includes liquidating a business that sells tangible personal property or a taxable service, when the liquidator holds out to the public that the business is conducted by the liquidator.

(Emphasis added.)

to TG § 11–101(*o*)(2), AT&T is jointly responsible with the out-of-state vendors for collecting and remitting the sales tax as a "representative" of the out-of-state vendor, which the Comptroller can elect to treat as an "agent" of the out-of-state vendor.

■ AT&T contends, however, that it cannot be jointly responsible for the tax as an agent of the vendor because AT&T is merely a common carrier that provided only transport services (for the information) over its telecommunication lines for the out-of-state vendors. AT&T maintains that, because it is a common carrier for the out-of-state vendors, the vendors do not have a substantial nexus with Maryland to make the 900 number transactions taxable events.

■ We agree that if an out-of-state vendor's only connection to the state is via a common carrier, the sale is not sufficiently tied to the state to be taxed. *National Bellas Hess v. Department of Revenue,* 386 U.S. 753, 758, 87 S.Ct. 1389, 1392, 18 L.Ed.2d 505 (1967) ("But the Court has never held that a State may impose the duty of use tax collection and payment upon a seller whose only connection with customers in the State is by common carrier or the United States mail."). A state tax will withstand scrutiny under the Commerce Clause of the United States Constitution, however, if " 'the tax is [1] applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State.' " *Goldberg,* 488 U.S. at 257–258, 109 S.Ct. 582 (quoting *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977)).

In *Goldberg,* the Supreme Court stated, 488 U.S. at 263, 109 S.Ct. 582:

We believe that only two States have a nexus substantial enough to tax a consumer's purchase of an interstate telephone call. The first is a State ... which taxes the origination or termination of an interstate telephone call charged to a service address within that State. The second is a State

which taxes the origination or termination of an interstate telephone call billed or paid within that State. See, *e.g.,* Ark.Code Ann. § 26–52–301(3) (Supp.1987); Wash. Rev. Code § 82.04.065(2) (1987).

As noted previously, Maryland satisfies these standards with respect to the 900 calls that are the subject of the Comptroller's assessment.

In *National Bellas Hess,* 386 U.S. at 754, 87 S.Ct. 1389, the Supreme Court ruled that an out-of-state seller's use of parcel common carriers to deliver goods to in-state customers did not provide a sufficient nexus to allow the state to assert its sales tax on the transaction. The Supreme Court reaffirmed this "bright line exemption from state taxation" in *Quill Corp. v. North Dakota,* 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), holding that an out-of-state mail order house, with neither outlets nor sales representatives in South Dakota, was not required to collect and pay the state's use tax for goods delivered in South Dakota.

■■ Courts have long held that, under many circumstances, telephone (and telegraph) companies are common carriers of messages. *Freschen v. Western Union Telegraph Co.,* 115 Misc. 289, 189 N.Y.S. 649, 651–52 (N.Y.City Ct.1921); *Hockett v. State,* 105 Ind. 250, 5 N.E. 178, 182–83 (1886). In the communications context, a common carrier "is one that makes a public offering to provide [communications facilities] whereby all members of the public who choose to employ such facilities may communicate or transmit intelligence of their own design and choosing. . . ." *F.C.C. v. Midwest Video Corp.,* 440 U.S. 689, 701, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979) (quotation and citation omitted). AT&T asserts that it is a common carrier with regard to the 900 number calls because it made a public offering to provide communications facilities by filing a tariff with the Federal Communications Commission. Under the tariff, AT&T agreed to provide transport (telecommunication) services over its 900 lines to any 900 number information provider willing to pay for such service.

As the tax court found in the case *sub judice,* however, AT&T's role exceeded that of a common carrier. AT&T provided much more to the information providers than the mere transport of the information over its telecommunication lines. At the March 18, 2004, hearing, the tax court summarized AT&T's substantial involvement in the 900 number transactions:

Number one, AT&T contacted an information provider and entered into an agreement with that provider and assigned a 900 telephone number.

AT&T reviewed advertisements that were placed, or I guess, prior to them being placed by the information provider to the public letting them know that a service was available.

AT&T reviewed preambles that were required to be put into the message that the consumer received over the phone, and AT&T reviewed content that was to be part of this message, at least in part, to categorize it.

Those functions were in response to federal statutes and regulations[,] in response to requirements by [local exchange carriers] and in response to AT&T policies of their own.

AT&T in addition to that, provided transport of the message over part of the network that was required.

AT&T provided billing for a majority of the information providers. The percentage varied over time and, in addition to that, captured information as to the length of the call, married that with the information from the information provider as to what they charged[,] and either then sent that to the [local exchange carrier] to create the bill for the consumer, sent the bill themselves or provided it to a third party biller to get the money collected, and AT&T provided dispute resolution.

Some of these requirements, again, were part of their own policies or part of requirements from federal statute or

regulations.[5]

Lastly, AT&T had a share in the total revenue produced by the operation. They received funds for transport and dispute resolution services that were required. And if they did collection, they received funds for collection.

In the findings in its memorandum opinion, the tax court further elaborated upon AT&T's role in providing the 900 service:

AT&T is involved in almost every step in the entire process. It did not actually write the content but reviewed the content of the message. AT&T also reviewed the advertisements to the public regarding the 900 service as well as the content of the required preambles. It also provided the transport of the message. The transport function is the only one most like that of a common carrier. AT&T often provided billing and collection activities. It also had a marketing staff to contact potential content providers with the intention of adding to the volume of the 900 service. It should be noted that within AT&T these services generated "Fat Sticky Minutes." The "Fat" part referring to the higher rate that AT&T charged for 900 minutes.

In *Bell Atlantic–Maryland, Inc. v. Comptroller,* Md. St. Tax Rep. (CCH) ¶ 201–611 (Md. Tax Ct. Jan. 18, 2000), a similar issue was before the tax court—whether the local telephone company was responsible for remitting state sales tax on amounts collected on behalf of content providers for 976 number calls. Bell Atlantic's role was similar to AT&T's role

---

**5.** AT&T argues that because some of its roles (*e.g.,* dispute resolution services) in providing the 900 service were required by federal regulations like the Telephone Disclosure and Dispute Resolution Act, 15 U.S.C. § 5701, those services should not impact the determination of whether AT&T is a "vendor." But, the fact that telecommunication companies like AT&T were legally obligated to provide additional services (*i.e.,* in addition to transport services) in the delivery of 900 services, tends to show that the federal government views companies like AT&T as more than common carriers, and imposes upon such telecommunication companies responsibilities typically associated with vendors or agents of vendors.

in providing 900 number calls. The tax court described Bell Atlantic's services that went beyond those of a mere common carrier, stating:

> Bell Atlantic provides for the transmission from the caller through its network to the equipment of the content provider. Bell Atlantic also keeps track of the usage, calculates the bills, sends the bills to the caller and collects the funds for services rendered. Bell Atlantic has some control over the advertising of the content providers, has some control over assuring that the content providers inform the public of certain charges, not only in the advertising but in the content itself.

The tax court in *Bell Atlantic* adopted the Comptroller's position and held that, because Bell Atlantic had an interest in promoting, and had products associated with, the 976 service, the telephone company was a "vendor" obligated to collect and remit the sales tax.

We agree with the tax court that, in the present case, the state tax exemption for common carriers would apply if AT&T were acting *solely* as a common carrier. But the tax court concluded that the transport function is the only one of AT&T's many functions (in providing the 900 service) that is like that of a common carrier. It is clear that AT&T is more than just an information conduit in this situation—AT&T, acting in cooperation with the out-of-state content providers, performed multiple acts that helped *create* the service. Because AT&T was involved in many steps in the 900 service transactions, AT&T's actions in this case went beyond the role of a common carrier.[6]

---

6. AT&T's involvement in providing the service is very different from that of other common carriers such as the postal service, Federal Express, or UPS. AT&T is more than just a delivery conduit for information being sold in the 900 number call. In this situation, the product itself cannot be separated from its transport. Callers buy the information or services from a 900 number not just for the information, but because it is being delivered over the phone. Without the delivery, there is no product. Unlike a product delivered via UPS, for example, it would not be possible for the 900 number consumer to buy the 900 number service separated from its delivery.

## II. AT&T is an agent of an out-of-state vendor

▮▮▮ Furthermore, AT&T's involvement in providing the 900 service not only took AT&T beyond the role of a common carrier, but also allowed the Comptroller to elect to consider AT&T a "representative" and "agent" of the out-of-state vendors, and created sufficient nexus between the out-of-state vendors and Maryland for this state to tax the sales.

As noted above, TG § 11–701(b) states that engaging in the business of an out-of-state vendor means "having an agent, canvasser, representative, salesman, or solicitor operating in the State for the purpose of **delivering,** selling, or taking orders for . . . a **taxable service.**" AT&T argues it cannot be considered a "representative" of the vendor because it neither sold nor delivered a taxable service to Maryland consumers.

We agree with the tax court's finding that the "taxable service" is not limited to the information provided by the content providers, but is the *entire* telecommunication service. The tax court stated:

> The following uncontested definition seems most appropriate to the Court concerning what a 900 call is: "When consumers place calls on their telephones, receive some information in response to those calls and pay for these transactions through their phone bills, it is a 900 call." The Court believes that using this definition, it is clear that the Legislature intended to tax the above described telephone service. This is the taxable event that shows up on the individual's phone bill.

We do not agree with AT&T that the service deemed taxable by the tax court was only the "sale of information." Rather, we agree with the tax court's statement that: "It is clear that the intent of the Legislature was to tax the **entire service** provided to the consumer in Maryland." (Emphasis added.) AT&T, because of its role in providing the 900 service, jointly provided the taxable service, along with the out-of-state vendors, to Maryland consumers.

We do agree with AT&T, however, that AT&T did not *sell* a taxable service to the consumers. A "sale" is defined in the

statute as "a transaction for consideration whereby ... a person performs a service for another person." TG § 11–101(i)(1). Although AT&T dealt directly with the out-of-state content providers, who sold the information/service to the callers, AT&T had no ownership interest in the information being provided and did not have the ability to set the price.

AT&T further contends that it did not "deliver" the taxable service to the consumers. Although the statute does not define "deliver," we note that *The American Heritage Dictionary*, 378 (3d College ed.2002), defines the term as "[t]o bring or transport to the proper place or recipient; distribute." AT&T maintains that simply providing transport services for the out-of-state vendors' information "does not equate to delivery." This contention is premised on the theory that the taxable service consists only of the information being sold to the consumer. As noted above, however, the taxable service is more than just the content of the 900 number call, but comprises the entire telecommunication transaction, as to which AT&T was substantially involved.

The Comptroller further argues that the legislature's intent to impose the tax on telecommunication providers for "delivering" the 900 service to consumers is clear. Although the legislature knew when it was drafting the statute that long-distance carriers like AT&T would have to provide the telecommunications lines to deliver the 900 service, no language in the statute states or implies that such telecommunication providers are exempt from collecting and remitting the sales tax. Moreover, the legislature made no distinction between the transport/delivery of the service and the content. We agree with the Comptroller's observation that the legislature and the tax court relied on "ordinary human understanding" in determining that telecommunication companies like AT&T, in providing transport and many other services for the out-of-state vendors, *delivered* the 900 service to the consumers.

We agree with the tax court that AT&T, as an agent of the out-of-state content providers that delivered a taxable service

in Maryland, is liable for the sales tax it failed to collect and remit.[7]

Accordingly, we affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

**7.** The Comptroller argues alternatively that, even if AT&T is not an agent of an out-of-state vendor, it can still be liable for not collecting and remitting the tax as a "retail vendor." TG § 11–701(c). Because we agree with the circuit court's finding that AT&T is an agent of the out-of-state vendors, we need not decide whether the Comptroller is correct in this alternative argument (and do not need to answer AT&T's third question presented).