950 A.2d 86

**AT&T COMMUNICATIONS OF MARYLAND, INC.**

**v.**

**COMPTROLLER OF the TREASURY.**

**No. 111, Sept. Term, 2007.**

Court of Appeals of Maryland.

June 12, 2008.

Paul Walter (William C. Sammons and Craig R. Haughton of Tydings & Rosenberg LLP, Baltimore), on brief, for petitioner.

John K. Barry, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, and Gerald Langbaum, Assistant Attorney General, Annapolis), on brief, for respondent.

Argued before BELL, C.J., RAKER,* HARRELL,

---

* Raker, J., now retired, participated in the hearing and conference of this case while an active member of this Court;  after being recalled pursuant to the Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

BATTAGLIA, GREENE, and JOHN C. ELDRIDGE,** (Retired, specially assigned) and DALE R. CATHELL, (Retired, specially assigned), JJ.

HARRELL, J.

## I.

This case involves a sales and use tax imposed by Maryland on charges made by out-of-state vendors to Maryland consumers of telecommunications information services beginning with the area code "900." We are asked whether AT&T Communications of Maryland (AT&T), over whose long-distance lines the communications from out-of-state vendors were transmitted to Maryland consumers, was obligated to collect the tax from the Maryland consumers and, failing to have done that, to be responsible for payment of the tax to the Comptroller.

Telephone numbers beginning with the 900 area code are assigned by the Federal Communications Commission (FCC) to telecommunications service providers, such as AT&T. Designation of a 900 area code reflects that information or services (such as sports scores, weather information, computer technical support, "date lines," or psychic readings) are being transferred over the carrier's lines. The telecommunications provider markets these lines to information providers who pay a tariffed rate to the telecommunications provider for carriage of the information services over an assigned line. When the end-consumer dials a 900 number, he or she is charged a fee by the information vendor. Typically, this fee is included on, or as an insert to, the consumer's monthly telephone bill.

According to the record, four parties participated in the transmission of the 900 number calls at issue in this case: the out-of-state information vendor, the local exchange carrier (such as Verizon), the long distance carrier (AT&T), and a Maryland consumer who placed the call. The out-of-state information vendor is the party who offered the information

---

** Eldridge, J., participated in the hearing and conference of this case, but recused himself prior to the adoption of this opinion.

for sale and decided what that information would be, created the content of the messages (including advertisements and scripts used by the persons providing the information to the consumers), determined the price to charge for the information, and marketed the 900 service to customers. The out-of-state information vendor purchased telecommunications services (transport) from the long distance carrier, AT&T. The out-of-state information vendor was responsible for payment to AT&T of a preset rate, found in and prescribed by tariffs published with either or both the FCC and the Maryland Public Service Commission. In short, the consumer dialed an AT&T-distributed 900–type number, a local carrier (such as Verizon) relayed the call to AT&T who, at a tariffed rate, relayed it to the out-of-state information vendor, and the out-of-state information vendor charged the customer for providing information.

As an option, an out-of-state information vendor also might use the carrier for billing and collection services for the 900–line services. In a majority of the transactions at issue here, AT&T generated a bill by combining its records of the length of the call made by the Maryland consumer with the information vendor's charge to the consumer. This charge was then included on, or with, the customer's telephone bill and labeled non-telecommunication charges.[1] When the customer paid for the information services, the carrier passed on the funds to the information vendor, less the fees AT&T charged for carrier, billing/collection, and arbitration services (to be explained further later in this opinion).

Since 1992, the Maryland General Assembly imposed a tax on the sale or use in Maryland of area code 900 telecommunication services. Maryland Code (1988, 2004 Replacement Volume), Tax General, § 11–101(m)(5).[2] The consumer/pur-

---

1. Either AT&T or a local exchange carrier actually sent the bill to the consumer.

2. Unless otherwise indicated, all subsequent Maryland Code section citations in this opinion are to Maryland Code (1988, 2004 Replacement Vol.), Tax General Article.

chaser of the taxed goods or services is obligated to pay the tax and the "vendor" of the service is obligated to collect and remit it to the Comptroller. § 11–401(a). Failure to collect the tax may result in the vendor being responsible itself for payment of the tax. *Id.* Two types of vendors under the statute may be liable for collection of the tax. A "retail vendor" is one who is liable for collection of the sales tax if "it sell[s] or deliver[s] tangible personal property or a taxable service in the state." § 11–701(c). An "out-of-state vendor" may be liable if, although located outside of Maryland, it has an "agent, canvasser, representative, salesman, or solicitor operating in the state for the purpose of delivering, selling, or taking orders for tangible personal property or a taxable service . . . ." § 11–701(b). The Comptroller is authorized to hold an agent jointly responsible for collection of the tax. § 11–101(*o*)(2).

On 17 May 2001, the Maryland Comptroller of the Treasury completed an audit and assessed to AT&T $5,160,899.45, plus interest, in sales and use taxes for 900 number services completed over its network from 1 January 1992 to 28 February 2001. AT&T applied for a revision (elimination) of the assessment, arguing that it was not a vendor or an agent of a vendor. Instead, according to AT&T, the out-of-state information vendors were the sole statutory parties responsible for collecting and remitting the tax. The Comptroller held a hearing on 12 July 2001 at which AT&T's application for revision was denied. The Comptroller found that AT&T was a co-vendor, or at least the agent of a vendor, of 900 telecommunication services responsible for collecting and remitting the sales tax, together with the information vendor.

AT&T appealed the assessment to the Maryland Tax Court and, on 17 and 18 March 2004, a hearing was held. The Comptroller asked the Tax Court to affirm his decision to assess to AT&T the tax because AT&T was either a co-vendor of the 900 number services or an agent of the information service vendors. AT&T advanced several counter-arguments: 1) it was not a vendor or an agent, but merely a regulated provider of telecommunication services (common carrier) to

the content vendors; 2) it was exempt from any responsibility for the tax, pursuant to the Commerce Clause (Article 1, § 8, cl. 3) of the United States Constitution, as a common carrier; 3) for taxing purposes, an insufficient nexus existed between AT&T's 900 number activities and the State of Maryland; and 4) the taxing statute was unconstitutionally vague. On 3 January 2005, the Tax Court rejected each of AT&T's contentions, concluding instead that AT&T's "function greatly exceeded that of a common carrier" and that AT&T "acted with the content providers in every step of the transaction[s]." The administrative agency determined further that the taxing statute was not unconstitutionally vague and that a sufficient nexus existed between AT&T and Maryland because AT&T has many connections with the State, although none specifically with regard to the 900 number services.

AT&T sought judicial review in the Circuit Court for Baltimore City. It again argued that it was a common carrier that could not be burdened constitutionally with either collection or remittance responsibilities for the state tax. Alternatively, AT&T argued that the statute was unconstitutionally vague and that the Tax Court's decision did not set out clearly the law and facts on which it relied to conclude that AT&T acted as a co-vendor or an agent of a vendor. Although the Circuit Court agreed that the Tax Court's opinion was not a "model of clarity," it affirmed the agency decision on the grounds that AT&T was both a co-vendor and an agent of a vendor. The court rejected AT&T's constitutional claims.

AT&T appealed to the Court of Special Appeals. It repeated its argument that it acted merely as a common carrier, exempt by virtue of the Commerce Clause from Maryland tax collection or remittance responsibilities in this case. *AT&T Commc'ns of Md., Inc. v. Comptroller of the Treasury*, 176 Md.App. 22, 932 A.2d 748 (2007). The intermediate appellate court concluded, however, that AT&T's role exceeded that of a common carrier. *Id.* at 33–35, 932 A.2d at 754–56. To support this result, the Court of Special Appeals relied on a summary of factual findings rendered by the Tax Court:

AT&T contacted an information provider and entered into an agreement with that provider and assigned a 900 telephone number.

AT&T reviewed advertisements that were placed, or I guess, prior to them being placed by the information provider to the public letting them know that a service was available.

AT&T reviewed preambles that were required to be put into the message that the consumer received over the phone, and AT&T reviewed content that was to be part of this message, at least in part, to categorize it.

. . . .

AT&T in addition to that, provided transport of the message over part of the network that was required.

AT&T provided billing for a majority of the information providers. The percentage varied over time and, in addition to that, captured information as to the length of the call, married that with the information from the information provider as to what they charged[,] and either then sent that to the [local exchange carrier] to create the bill for the consumer, sent the bill themselves or provided it to a third party biller to get the money collected, and AT&T provided dispute resolution.

. . . .

Lastly, AT&T had a share in the total revenue produced by the operation. They received funds for transport and dispute resolution services that were required. And if they did collection, they received funds for collection.

*Id.* at 33–34, 932 A.2d at 754–55. Thus, the court determined that AT&T's total involvement in providing the 900 number services was adequate to support the Comptroller's and Tax Court's conclusion that AT&T acted as an agent of the out-of-state vendors (information service providers), creating a nexus between the service providers and Maryland sufficient for the State to require AT&T to collect and remit the tax on the information service sales. *Id.* at 37–38, 932 A.2d at 757.

We granted AT&T's petition for a writ of certiorari. 402 Md. 355, 936 A.2d 852 (2007). AT&T frames one question for our consideration:

Whether, in light of the Supreme Court's "bright-line" test in *National Bellas Hess [Inc. v. Department of Revenue of Illinois*, 386 U.S. 753, 87 S.Ct. 1389, 18 L.Ed.2d 505 (1967) ] and *Quill [Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) ], substantial nexus is created, thereby permitting Maryland to require a common carrier to collect a use tax on a sale from an out-of-state seller to a Maryland customer, when the out-of-state seller uses the common carrier to deliver its product (or service), and when the common carrier provides the out-of-state seller with services ancillary to, and in addition to, the delivery of the product (or service).

## II.

The Maryland Tax Court acts as an administrative agency, not a court. *Harford County v. Saks Fifth Ave. Distrib. Co.,* 399 Md. 73, 88 n. 14, 923 A.2d 1, 10 n. 14 (2007) (citing *Shipp v. Bevard,* 291 Md. 590, 592 n. 1, 435 A.2d 1114, 1115 n. 1 (1981)). "[A] reviewing court must affirm the decision of the Tax Court if its order 'is not erroneous as a matter of law,' and if the order 'is supported by substantial evidence appearing in the record.'" *Comptroller of the Treasury v. Citicorp Intern. Commc'ns, Inc.,* 389 Md. 156, 163, 884 A.2d 112, 116 (2005) (quoting *CBS, Inc. v. Comptroller of the Treasury,* 319 Md. 687, 697–98, 575 A.2d 324, 329 (1990)). With regard to its resolution of purely legal issues, a degree of deference to the Tax Court's interpretation and application of a statute that it administers is often appropriate to be accorded by a reviewing court. *Citicorp Intern. Commc'ns, Inc.,* 389 Md. at 163, 884 A.2d at 116 (citing *Charles County Dep't of Social Servs. v. Vann,* 382 Md. 286, 295–96, 855 A.2d 313, 319 (2004)); *Md. Aviation Admin. v. Noland,* 386 Md. 556, 572, 873 A.2d 1145, 1154 (2005) (citing *Lussier v. Md. Racing Comm'n,* 343 Md. 681, 696–97, 684 A.2d 804, 811–12 (1996)). It should be noted however, that although we "frequently give

weight to an agency's experience in interpretation of a statute that it administers, . . . it is always within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy them if wrong." *Schwartz v. Md. Dept. of Natural Res.*, 385 Md. 534, 554, 870 A.2d 168, 180 (2005).

■ The Comptroller asserts that the issue before us is a mixed question of fact and law, the resolution of which implicates the exercise of the agency's expertise and so its decision is owed greater deference on judicial review. *Citicorp Intern. Commc'ns, Inc.*, 389 Md. at 164, 884 A.2d at 116–17. AT&T does not dispute the factual connections found below as they relate to the transactions at issue. Rather, AT&T argues that these connections, as a matter of law, do not suffice to distinguish those circumstances from those of the entities in U.S. Supreme Court's decisions in *Quill* and *National Bellas Hess*. As such, it deems the issue for resolution by us to be a purely legal question. We approach our analysis as one involving a question of law.

## III.

### A.

■ The Commerce Clause of the United States Constitution, Art. 1, § 8, cl. 3, reserves to Congress the power "[t]o regulate Commerce of foreign nations, and among the several states, and with the Indian Tribes." "Even where Congress has not acted affirmatively to protect interstate commerce, the so-called dormant Commerce Clause prevents the states from discriminating against such commerce." *Chesapeake and Potomac Tel. Co. of Md. v. Comptroller of Treasury*, 317 Md. 3, 7 n. 2, 561 A.2d 1034, 1036 n. 2 (1989). The Supreme Court established a four-prong test for assessing the validity, under the Commerce Clause, of a state tax imposed on a transaction where an out-of-state entity is one of the essential parties. In *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977), the Court stated that a tax is valid when it is "applied to an activity with a substantial nexus with the taxing State, is fairly apportioned,

does not discriminate against interstate commerce, and is fairly related to the services provided by the State." The present case implicates the first prong of this analysis.

█ When a state wishes to tax an entity located beyond its borders, as in the case of a sales tax on an out-of-state seller, there must exist a "substantial nexus"—a "definitive link"— between the state and the person or transaction it seeks to tax. *Scripto, Inc. v. Carson,* 362 U.S. 207, 210–11, 80 S.Ct. 619, 621, 4 L.Ed.2d 660 (1960); *Miller Bros. Co. v. State of Md.,* 347 U.S. 340, 344–45, 74 S.Ct. 535, 539, 98 L.Ed. 744 (1954). In *National Bellas Hess, Inc. v. Department of Revenue of Illinois,* 386 U.S. 753, 753, 87 S.Ct. 1389, 1389, 18 L.Ed.2d 505 (1967), the petitioner, National, was a mail order company incorporated in Delaware but with its principal place of business located in North Kansas City, Missouri. Of concern was an Illinois use tax that, according to the Illinois Department of Revenue and the Illinois Supreme Court, National was required to collect from Illinois purchasers of its products and pay over to Illinois. *Nat'l Bellas Hess,* 386 U.S. at 753–54, 87 S.Ct. at 1389–90, 18 L.Ed.2d 505. The Court explained National's relationship with Illinois:

National does not maintain in Illinois any office, distribution house, sales house, warehouse or any other place of business; it does not have in Illinois any agent, salesman, canvasser, solicitor or other type of representative to sell or take orders, to deliver merchandise, to accept payments, or to service merchandise it sells; it does not own any tangible property, real or personal, in Illinois; it has no telephone listing in Illinois and it has not advertised its merchandise for sale in newspapers, on billboards, or by radio or television in Illinois.

All of the contacts which National does have with the State are via the United States mail or common carrier. Twice a year catalogues are mailed to the company's active or recent customers throughout the Nation, including Illinois. This mailing is supplemented by advertising 'flyers' which are occasionally mailed to past and potential custom-

ers. Orders for merchandise are mailed by the customers to National and are accepted at its Missouri plant. The ordered goods are then sent to the customers either by mail or by common carrier.

*Nat'l Bellas Hess, Inc.*, 386 U.S. at 754, 87 S.Ct. at 1390, 18 L.Ed.2d 505 (1967) (citing *Dept. of Revenue v. Nat'l Bellas Hess, Inc.*, 34 Ill.2d 164, 214 N.E.2d 755, 757 (1966)). Justice Fortas, in dissent, noted that many of the goods were purchased on credit or C.O.D.[3] *Id.* at 761, 87 S.Ct. at 1394, 18 L.Ed.2d 505 (Fortas, J., dissenting).

The Court, in reflecting on its earlier relevant cases, observed that it "has never held that a State may impose the duty of use tax collection and payment upon a seller whose only connection with customers in the State is by common carrier or the United States mail." *Id.* at 758, 386 U.S. 753, 87 S.Ct. at 1392, 18 L.Ed.2d 505. The Court found that "to uphold the power of Illinois to impose use tax burdens on National in this case, [it] would have to repudiate totally the sharp distinction which these and other decisions have drawn between mail order sellers with retail outlets, solicitors, or property within a State, and those who do no more than communicate with customers in the State by mail or common carrier as part of a general interstate business." *Id.* The Court declined to do so. *Id.*

In *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992), the Supreme Court reconsidered *Bellas Hess* in light of its Commerce Clause decisions rendered between 1967, when *Bellas Hess* was decided, and 1992. The Court detected in those more recent decisions a movement away from a "stringent physical presence test" toward a "more flexible substantive approach"; nonetheless, the Court refused to overturn entirely *Bellas Hess*.[4] *Quill,* 504 U.S. at

---

**3.** C.O.D., of course, is an acronym for cash, or collect, on delivery. The term indicates that the amount due for purchase of an item is to be paid to the common carrier or other delivering entity by the consumer.

**4.** Specifically, the Court declared that the portion of the *Bellas Hess* analysis relying on the Commerce Clause remained good law. The

314, 112 S.Ct. at 1914, 119 L.Ed.2d 91. The Court reasoned that, "[a]lthough we have not, in our review of other types of taxes, articulated the same physical-presence requirement that *Bellas Hess* established for sales and use taxes, that silence does not imply repudiation of the *Bellas Hess* rule." *Id.* The Court went on to explain that

> the bright-line rule of *Bellas Hess* furthers the ends of the dormant Commerce Clause. Undue burdens on interstate commerce may be avoided not only by a case-by-case evaluation of the actual burdens imposed by particular regulations or taxes, but also, in some situations, by the demarcation of a discrete realm of commercial activity that is free from interstate taxation. *Bellas Hess* followed the latter approach and created a safe harbor for vendors whose only connection with customers in the taxing State is by common carrier or the United States mail. Under *Bellas Hess,* such vendors are free from state-imposed duties to collect sales and use taxes.

> Like other bright-line tests, the *Bellas Hess* rule appears artificial at its edges: Whether or not a State may compel a vendor to collect a sales or use tax may turn on the presence in the taxing State of a small sales force, plant, or office. *Cf. National Geographic Society v. California Bd. of Equalization,* 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977); *Scripto, Inc. v. Carson,* 362 U.S. 207, 80 S.Ct. 619, 4 L.Ed.2d 660 (1960). This artificiality, however, is more than offset by the benefits of a clear rule. Such a rule firmly establishes the boundaries of legitimate state authority to impose a duty to collect sales and use taxes and reduces litigation concerning those taxes.

*Id.* at 315–16, 112 S.Ct. at 1914–15, 119 L.Ed.2d 91. The Supreme Court then applied the "bright-line test" of *Bellas Hess* to the facts before it. *Quill,* like *Bellas Hess,* involved a

---

*Bellas Hess* decision also rested on due process grounds. In *Quill,* the Court abandoned that ground, concluding that due process did not support the *Bellas Hess* decision. *Quill,* 504 U.S. at 306–08, 112 S.Ct. at 1909–11, 119 L.Ed.2d 91.

large mail order house (a Delaware corporation with offices and warehouses in Illinois, California, and Georgia) that solicited business and sold merchandise in North Dakota (among other places) by sending by common carrier and the U.S. mail catalogs, solicitations, and merchandise to, among others, customers in North Dakota. *Id.* at 301–02, 112 S.Ct. at 1907–08, 119 L.Ed.2d 91. The Court found no substantial nexus between Quill and North Dakota; therefore, North Dakota could not impose sales and use tax collection duties on Quill. *Id.* at 319, 504 U.S. 298, 112 S.Ct. at 1916, 119 L.Ed.2d 91.

■ AT&T, in the present case, asserts that "[a]n unspoken, but necessary, corollary ... is that a common carrier cannot be deemed to be the agent of the out-of-state seller for the purpose of creating a nexus and permitting state taxation of the interstate sale (or use in the state)." To hold otherwise, according to AT&T, would be contrary to the *Quill* and *Bellas Hess* holdings because the companies in those cases utilized common carriers to move goods or information into the taxing states, but, in the process, the Court did not find the common carriers to be their agents within the state. We agree with AT&T on this point,[5] but that view births two additional issues requiring resolution. First, is a telecommunications provider a common carrier for purposes of *Quill* and *Bellas Hess?* Second, if that is answered in the affirmative, did AT&T here act in a manner placing it beyond the role of a common carrier with regard to the 900 number transactions at issue.

**B.**

■ Carriers, as transporters of property or persons from one place to another, ordinarily are classified as "private" or "common." *Rutledge Co-op. Ass'n v. Baughman,* 153 Md. 297, 301, 138 A. 29, 31 (1927). "[T]he test generally recognized for

---

5. Thus, we do not agree with the Comptroller and Court of Special Appeals that, even if AT&T were correct that it acted only as a common carrier in the 900 service transactions, AT&T could be deputized to collect the sales tax accrued when consumers used the 900 information services. *See AT&T Commc'ns of Md., Inc. v. Comptroller of the Treasury,* 176 Md.App. 22, 29 n. 2, 932 A.2d 748, 752 n. 2 (2007).

distinguishing a private from a common carrier is that a common carrier is obliged, within the limits of its ability, to serve all who apply, while a private carrier is under no such obligation." *Id.* As noted by the Court of Special Appeals in the present case, "[c]ourts have long held that under many circumstances, telephone (and) telegraph companies are common carriers of messages." *AT&T Commc'ns of Md.*, 176 Md.App. at 32, 932 A.2d at 754 (citing *Freschen v. W. Union Tel. Co.*, 115 Misc. 289, 189 N.Y.S. 649, 651–52 (N.Y.City.Ct. 1921); *Hockett v. State*, 105 Ind. 250, 5 N.E. 178, 182–83 (1886)). The U.S. Supreme Court made a similar assessment when it noted in *F.C.C. v. Midwest Video Corp.*, 440 U.S. 689, 701, 99 S.Ct. 1435, 1442, 59 L.Ed.2d 692 (1979):

> A common-carrier service in the communications context is one that makes a public offering to provide communications facilities whereby all members of the public who choose to employ such facilities may communicate or transmit intelligence of their own design and choosing. A common carrier does not make individualized decisions, in particular cases, whether and on what terms to deal. (Internal quotations omitted.)

█ AT&T asserts that it is a common carrier in this case because it made a public offering to provide 900 number carriage by filing tariffs with the FCC and state public service commissions. Through these tariffs, AT&T agreed to provide transport service over its 900 number designated lines to any 900 number information vendor willing to pay for such services, at set prices. The record in this case supports AT&T's proposition and we conclude that AT&T may be characterized reasonably as a common-carrier.[6]

█ We agree with the Tax Court's and the Court of Special Appeals's analytical premise that, although an entity may meet the requirements for classification as a common-

---

6. The Court of Special Appeals and the Tax Court similarly came to this conclusion, although they went on to find that AT&T greatly exceeded that role through its ancillary actions. *AT&T Commc'ns of Md.*, 176 Md.App. at 32–33, 932 A.2d at 754.

carrier, it may transcend that classification by taking actions in a given context that exceed those normally associated with acting as a common carrier. By its actions, an entity normally deemed a common carrier may associate itself so much with a transaction as to lose the cloak that protects it and the transaction, under *Bellas Hess* and *Quill,* from a State's power to tax (or impose the duty to collect a tax). In that circumstance, the State may require both the out-of-state vendor and the interested common-carrier to collect a sales or use tax, provided that the tax otherwise complied with *Complete Auto's* four prong test. *Complete Auto Transit,* 430 U.S. at 279, 97 S.Ct. at 1079, 51 L.Ed.2d 326; *see also Goldberg v. Sweet,*[7] 488

---

**7.** In *Goldberg,* the Supreme Court found that an Illinois tax on the transport (carriage) charge that telephone companies assessed Illinois consumers for interstate calls did not violate the Commerce Clause. *Goldberg v. Sweet,* 488 U.S. 252, 254–57, 109 S.Ct. 582, 585–86, 102 L.Ed.2d 607 (1989). The tax was required to be assessed by the telephone company to the consumer of the carriage, the in-state caller. *Id.* The Comptroller in the present case relies on *Goldberg* as dispositive of the issues before us. We conclude, however, that *Goldberg,* is inapposite.

The petitioners in *Goldberg* conceded that the first prong of the *Complete Auto Transit* test—the requirement that the taxed activity have a substantial nexus with the taxing state—was met because the tax was on carriage used, billed, and paid for by the in-state consumer. *Id.* at 260, 109 S.Ct. at 588, 102 L.Ed.2d 607. In the present case, however, the party who used, was billed for, and paid carriage to AT&T was the out-of-state information vendor; thus a substantial nexus to this aspect of the transaction is lacking. Maryland seeks to tax the in-state consumption of information services provided by out-of-state entities, a transaction for which the out-of-state entity charges the Maryland consumer approximately $2.72 cents per minute over that which the out-of state entity pays AT&T for carriage.

This Court is forced to conclude, as a default position in this case, that a substantial nexus is not apparent where a common carrier, AT&T, delivers a service provided by out-of-state entities, a situation on its face analogous to that described in *Quill* and *Bellas Hess.* It is only in the event that AT&T exceeds its common carrier role and becomes the co-vendor with, or agent for, the information providers that AT&T's other activities within Maryland may create a substantial nexus such that it may be held responsible for the tax. *See Nat'l Geographic Soc'y v. Cal. Bd. of Equalization,* 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977) (holding that facilities and offices within a state, such as those AT&T has in Maryland, may create a sufficient nexus for the collection of a use tax, although the facilities and the taxed activity are unrelated).

U.S. 252, 263, 109 S.Ct. 582, 590, 102 L.Ed.2d 607 (1989); *Nat'l Geographic Soc'y v. Cal. Bd. of Equalization,* 430 U.S. 551, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977).

## C.

The Tax Court and the Court of Special Appeals determined that AT&T exceeded the customary role of the common carrier by having substantial involvement with the taxed 900–number transactions because it: 1) contracted with the information providers to provide a 900 number; 2) reviewed the advertisements of any information provider with whom it contracted; 3) reviewed the preamble messages and content that the information provider delivered to the consumers; 4) provided transport of the information providers' messages over part of its network; 5) provided billing and collection services for many (but not all) of the information providers with which it contracted; 6) provided dispute resolution services for the information providers and Maryland consumers; and 7) received funds for the transport, dispute resolution, and billing/collection services it provided. AT&T counters that these services, taken in whole or in part, do not suffice to distinguish it from a telecommunications or any other type of common carrier embraced within the saving analysis of *Quill* and *Bellas Hess.* We agree with AT&T.

At the outset, we note that the first and the fourth considerations (assignment of a number and carriage of information) describe functions that are the very definition of a telecommunications common carrier. AT&T made a "public offering" to provide 900 communications services "whereby all members of the public" choosing to utilize them "may communicate or transmit intelligence of their own design and choosing." *F.C.C. v. Midwest Video Corp.,* 440 U.S. at 701, 99 S.Ct. at 1442, 59 L.Ed.2d 692. Thus, these considerations do not support a conclusion that AT&T was acting as an agent of the information vendor or as a co-vendor, rather than as a common carrier.

The second, third, and sixth considerations relied on by the Tax Court represent duties imposed on AT&T, with regard to 900 number carriage, under the Telephone Disclosure and Dispute Resolution Act (TDDRA). Pub.L. No. 102–556 (1992). The Act establishes common carrier requirements with regard to, and empowers the Federal Trade Commission (FTC) and the FCC to regulate, pay-per-call services. The impetus for the Act lay in the problem that some pay-per-call businesses previously engaged in misleading or otherwise harmful practices. *Id.* § 1(b)(5). Congress determined that the interstate nature of the pay-per-call industry necessitated federal regulatory treatment. *Id.* § 1(b)(3). As part of its overall plan for oversight, Congress set out in the Act certain "common carrier obligations." *Id.* § 228. First, and most broadly, "[a]ny common carrier assigning [a 900 number] shall require by contract or tariff that such provider comply with the provisions of titles II [regulating unfair and deceptive acts and practices associated with pay-per-call services] and III [regulating billing and collection practices] of the ... Act ... and ... regulations prescribed by the [FTC] pursuant to those titles." *Id.* § 228(c)(1). Second, the common carrier must keep records for production to federal or state authorities detailing a list of 900 numbers associated with each information provider, services associated with these numbers, and costs associated with the services, as well as the name, address and business telephone number associated with the service provider. *Id.* § 228(c)(2).[8] If a common carrier, in its congressionally and regulatorily mandated role as compliance officer under the TDDRA, determines that an information provider is in breach of the TDDRA, it must terminate the information provider's access to consumers through its carriage. *Id.* Third, if the common carrier provides billing and collection services, it must also set up a toll-free number to handle complaints and claim resolution services for consumers. *Id.* §§ 228(d), 301(a)(1); 47 CFR §§ 64.1510–64.1511.

---

**8.** This provision also includes the catch-all requirement that the common carrier keep any other records that the Federal Trade Commission, by regulation, may require.

According to the record in the present case, neither the Tax Court nor any reviewing Maryland court to date found that AT&T's actions with regard to its review of the information service vendor's advertising, preamble, and message content, or with regard to its dispute resolution services, were activities that exceeded those which it was obligated by the TDDRA to provide. AT&T reviewed, but did not author, the actual vendor's advertising, preamble, or message content. When a consumer disputed a transaction with an information provider, AT&T provided required dispute resolution services, but had no vested interest in the success of the information provider in collecting from the consumer what it alleged was due. The information provider was obliged to pay AT&T for AT&T's services regardless of whether it received funds from a consumer in a disputed transaction. Additionally, had AT&T not performed these services, it would have been in direct violation of the TDDRA and been subject to potential liability in a Federal forum. In carrying out these particular functions, AT&T, we are persuaded, did not act to promote or in some other way assume a vested interest in the success of the contracting information vendors' ventures such that AT&T exceeded its role as a common carrier.[9]

The Comptroller, the Tax Court, and the courts below relied on AT&T's billing and limited collection services on behalf of the information service providers as another basis for concluding that the common carrier acted as a co-vendor or agent of the information vendors, stepping outside its role as a common

---

**9.** We, therefore, disagree with the Court of Special Appeals's conclusion that "the fact that telecommunication companies like AT&T were legally obligated to provide additional services ... in the delivery of 900 services tends to show that the federal government views companies like AT&T as more than common carriers...." *AT&T Commc'ns of Md.*, 176 Md.App. at 34 n. 5, 932 A.2d at 755 n. 5. This assumption is without support in the TDDRA, in which Congress specifically addresses 900 number services as interstate transactions, over which it presumes state governments lack control. Pub.L. No. 120–556, § 1(b)(2). Congress also specifically identifies in the Act companies like AT&T, who provide carriage, as "common carriers." *Id.* § 228. Congress did not view companies like AT&T as co-vendors or agents of the information service vendors.

carrier. With regard to these actions, the record establishes that AT&T combined the rate that the information provider specified should be charged with its log of the length of the transmission from the information provider to the consumer. These charges appeared in the consumer's telephone bill as an insert or delineated separate section. The consumer received this bill either from AT&T or it was included in the bill sent by the local carrier. In case of a billing dispute, AT&T provided arbitration services, but did not assist the information provider in further collection activities. Based on these undisputed facts, AT&T's role in billing and collection is analogous to that of the common carrier in *Bellas Hess*. In that case, some goods were shipped, by common carrier, C.O.D. *Bellas Hess*, 386 U.S. at 761, 87 S.Ct. at 1394, 18 L.Ed.2d 505 (Fortas, J., dissenting). This fact did not affect the outcome in *Bellas Hess*.

All of the types of services provided by AT&T in the circumstances of this case appear to be services typically provided by common carriers in analogous contexts. Besides its tariffed shipping rates, when the common carrier, FedEx,[10] ships a package C.O.D., it charges $9.00 plus 2% of the C.O.D. amount if it is in excess of $450.00 for currency C.O.D.s. FedEx, Fees and Other Shipping Information, http://images. fedex.com/us/services/pdf/Fees_Shipping_Information.pdf (last visited 23 May 2008). In the case of electronically-collected C.O.D. deliveries, FedEx collects money and places it directly into the shipper's bank account, while collecting a service charge and a C.O.D. delivery charge. *Id.* FedEx is required to comply with federal law concerning any shipment of hazardous materials. *See* FedEx Ground, Hazardous Materials Shipping Guide, http://images.fedex.com/us/services/pdf/Hazmat ShippingGuide.pdf (last visited 23 May 2008). Additionally, FedEx has internal policies, under which it may also refuse to act as carrier of materials over a certain size, animals, and other goods, though it is not prohibited from doing so by

---

10. FcdEx is a common carrier. *FedEx Corp. v. United States,* 412 F.3d 617, 617 (6th Cir.2005).

federal law.  FedEx, Service Info: Restrictions, https://www.fedex.com/us/services/termsandconditions/restrictions.html (last visited 23 May 2008).  Finally, FedEx provides dispute resolution services associated with its C.O.D. services.  FedEx, Claims Form Instructions and Frequently Asked Questions, http://images.fedex.com/us/customer/claims/Claims_Form.pdf (last visited 15 May 2008).  Obviously, if FedEx is to comply with federal law and its own internal policies, it too must take on, to an extent, the role of regulatory compliance overseer.  Other common carriers, such as UPS and USPS, offer the same or similar services and act in a compliance overseer role.  *See generally* http://www.ups.com; www.usps.com.  There can be no real dispute that FedEx, UPS, and USPS are common carriers of the type embraced by *Bellas Hess* and *Quill.*  In comparison, we are not able to distinguish meaningfully AT&T's activities here from those activities.

The final consideration relied on by the Tax Court (and the intermediate appellate court) was the fact that AT&T collected money for the services it provided.  Although labeling this activity as collecting "a share of the total revenue produced by the operation," such a characterization is misleading because it was established before the Tax Court, and never disputed, that AT&T received funds for the services provided regardless of whether the information services provider received payment from the consumer.  AT&T collected a share of the total revenue in the same sense that FedEx, UPS, or USPS do for common carrier services.  In every case, the carrier is paid its due regardless of whether the consumer pays.[11]  Although some note below was made of the fact that AT&T received a percentage of the total charges for the information services if it provided billing and collection services to the information service provider, this is no different in principle than the actions of FedEx when it collects a percentage of the total costs of C.O.D. sales over $450.00.

---

11.  Paraphrasing a Louis XVI-like character in Mel Brooks's movie HISTORY OF THE WORLD, PART I (Twentieth Century Fox, 1981), "it is good to be king [a common carrier]."

The uncontested factual findings in this case establish only that AT&T acted as a common carrier with regard to the 900 number transactions at issue. Thus, under *Bellas Hess* and *Quill,* AT&T may not be held responsible for the 900 number sales and use tax on transactions between Maryland consumers and the information services vendors without violating the Commerce Clause of the U.S. Constitution. The Comptroller's assessment against AT&T in this case is not permissible.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH DIRECTIONS TO REVERSE THE DECISION OF THE MARYLAND TAX COURT AND TO REMAND THE CASE TO THE TAX COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.**